IN THE MATTER OF ROBERT M. FORD.

Suffolk. February 24, 1989. — March 14, 1989.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Judge.*

A lengthy course of misconduct by a judge of the Probate and Family Court Department, which included (a) the exercise of his powers of appointment with favoritism, in violation of Canon 3 (B) (4) of the Code of Judicial Conduct [349-352]; (b) his conducting the affairs of a charitable corporation, of which he was the president, in a manner designed to bring economic advantage to himself, his family, and his friends, so as to amount to the impermissible management of a business in violation of Canon 5 [352-354]; and (c) violation of Canon 2 (A) in several respects, involving the affairs of the charitable corporation as well as the administration of the court of which he served as first judge, in that he did not conduct himself in a manner that promotes public confidence in the integrity of the judiciary [354-356], warranted public censure of the judge by this court, his suspension from administrative functions, and an assessment of costs against the judge in a substantial amount [356-358].

PROCEEDING in relation to an inquiry concerning a judge, commenced in this court on June 22, 1988.

The following counsel submitted memoranda:

*Robert J. Muldoon, Jr.*, Special Counsel, for the Commission on Judicial Conduct.

*Lawrence T. Perera & Diane C. Tillotson* for Robert M. Ford.

BY THE COURT. A complaint was filed with the Commission on Judicial Conduct (Commission) against Judge Robert M. Ford, first judge of the Probate and Family Court in Norfolk County. It concerned Judge Ford's lengthy involvement with the New England Anti-Vivisection Society (NEAVS). After extended proceedings before the Commission, that body on June 22, 1988, filed its report with this court, including therein its recommendation that this court should impose a public cen-

sure on Judge Ford.[1] We made the Commission's report public together with its supporting appendices. This court did not rule at that time as to the disposition to be imposed in the matter.

Subsequently, we directed an extensive further investigation of the matter by our staff, and later by a court-appointed special master and commissioner, Mr. Charles B. Swartwood, III. His report, together with its supporting appendix, is now made a part of the public record in this case. Aside from the special master and commissioner's findings, the facts recited below and interspersed in later parts of this opinion are, except for certain inferences drawn by this court, established from a statement of facts agreed to by the judge before the Commission, from the responses of the Commission and of Judge Ford to further inquiries of the court, from records of NEAVS, and from public records of the Commonwealth and the Norfolk County Probate and Family Court.

Judge Ford became a NEAVS member in 1963 or 1964, was elected to the board of directors shortly thereafter, became vice president in the early 1970's, and became president in 1981. While president, he devoted a great deal of time to NEAVS; he restructured its management, he updated and rejuvenated its publications; he supported alternative techniques for medical research, and he developed new educational programs intended to increase awareness of NEAVS's objectives in Massachusetts schools and colleges. Judge Ford exercised

[1] The Commission, in a detailed analysis, found that Judge Ford violated several specific Canons of the Code of Judicial Conduct. It summarized its conclusions as follows: "Judge Ford's false statements on the federal and state forms, signed under the pains and penalties of perjury, do not demonstrate respect and compliance with the law. Furthermore, it is unseemly that a judge who, by law, must provide full-time service to the Commonwealth, should be paid, in effect, another full-time salary. Judge Ford's use of the funds of a public charity to supplement his own income, to provide for his retirement years, and to support myriad relatives, friends, and friends' relatives also constitutes a breach of the Code of Judicial Conduct. His encouraging court employees to join the organization so that they could vote to put or keep him in an office where he had the power to do such things is improper as well. Judge Ford's use of his hiring power at NEAVS and his appointment power on the bench to advance the private interests of a favored court employee and her brother is also egregious."

primary executive responsibility for setting the goals of NEAVS, determined how they should be implemented, and hired staff, consultants, and attorneys. Judge Ford resigned from NEAVS on January 15, 1987.

Judge Ford was appointed a Probate Court judge in 1967 and became first judge in Norfolk County in 1975. While NEAVS president, Judge Ford performed his full share of judicial and administrative duties at the Norfolk County Probate and Family Court promptly and efficiently. His NEAVS-related activities did not interfere with his judicial duties.

1. JUDGE FORD EXERCISED HIS POWERS OF APPOINTMENT WITH FAVORITISM, IN VIOLATION OF CANON 3 (B) (4).

Canon 3 (B) (4) of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 382 Mass. 809 (1981), provides: "A judge should not make unnecessary appointments. He should exercise his power of appointment only on the basis of merit, avoiding nepotism and favoritism. He should not approve compensation of appointees beyond the fair value of services rendered."

*Attorney J. Michael Roberts.*

From 1979 through 1988, Judge Ford appointed Attorney J. Michael Roberts in 305 different Probate Court matters, from which Mr. Roberts received a total of $264,724.69 in fees.

Sixty-four per cent of these 305 appointments were as guardian ad litem in Medicaid trusts, "Rogers cases," and medical treatment cases. Mr. Roberts had special competence in these types of cases. Of the other 36% of his appointments, most were as master in divorce and other cases, and as guardian ad litem in estates or trusts.

Despite the marked redundancy of appointments to Mr. Roberts, we accept the premise that the above 64% of the cases were directed to Mr. Roberts for reasons consistent with impartiality on the part of the judge.[2] Nevertheless, the records

---

[2] We recognize that some redundancy of appointments may be justified by the special qualifications of an appointee, the needs of the court, and the unavailability of other persons having the required qualifications and a willingness to accept appointments.

disclose that, for the remaining 36% of the appointments where no special expertise has been shown, Mr. Roberts received a total of $136,773.04 in fees. We conclude, from our common experience, that these total payments would not have occurred in any reasonable rotation of appointments among competent and available counsel. This was an inordinate diversion of fees to Mr. Roberts by Judge Ford, and favoritism in appointments has been thus shown, contrary to the mandate of Canon 3 (B) (4).

Our conclusion that favoritism has been shown to Mr. Roberts in probate appointments is confirmed by the fact that Judge Ford hired Mr. Roberts as a staff person for NEAVS, and for the years 1981 through 1985, Mr. Roberts received $87,394 in salary from NEAVS. This simultaneous attention by Judge Ford to Mr. Roberts's interests, in court appointments and in disbursements from NEAVS, supports a clear inference that court appointments to Mr. Roberts were based on partiality and not on merit.

Partiality to Mr. Roberts is also shown by the fact that Mr. Roberts's sister, Lisa Roberts, who was first assistant register in the Norfolk Probate Court became, after Judge Ford assumed the presidency of NEAVS, a member of that organization's board of directors as well as its vice president and, as coordinator of NEAVS publications, received from NEAVS, from 1981 through 1986, $124,782 in salary. NEAVS's funds were also used to establish a pension fund for her, and to pay in part for a graduate program in tax law for her.

During Judge Ford's presidency, also, NEAVS employed three of Mr. Roberts's other relatives and two of his "in-laws," one of whom was elected to the board of directors. In short, if further proof were needed that Judge Ford's redundant probate appointments to Mr. Roberts were a palpable abuse of the judge's obligations under Canon 3 (B) (4), that proof is found in the demonstrated support of the Roberts family members in the NEAVS context.

*Attorney M. Arthur Gordon.*

From 1979 through 1986, Judge Ford made a total of forty-six appointments of Norfolk county real estate commissioners.

These commissioners were appointed to accomplish the sale, by court order, of real estate owned jointly by litigants. Fees of the commissioners in all cases were paid out of the sale proceeds. Attorney M. Arthur Gordon was appointed as commissioner by Judge Ford in nineteen (41%) of these cases. From these nineteen appointments, court records show that Mr. Gordon received a total of $120,821 in fees. Mr. Gordon died in 1986, and thereafter his estate received a total of $46,500 in fees from several of the appointments which were completed after his death.[3]

This showing of $167,321 in fees received in seven years from 41% of all such appointments demonstrates, without more, a gross abuse by Judge Ford of his powers of appointment, in violation of Canon 3 (B) (4). Further proof of the judge's partiality and favoritism to Mr. Gordon is again found, as in the case of Mr. Roberts, in Mr. Gordon's activities as a member of NEAVS. For the election of officers and directors of NEAVS in January, 1982, Judge Ford appointed Mr. Gordon as one of the members of the credentials committee (which determined the eligibility of persons who wished to vote in the election) and as one of five members of the nominating committee for the election. Judge Ford was nominated and elected at the January, 1982, annual meeting of the membership. Again, for the election of 1983, Judge Ford named Mr. Gordon as one of five members of the nominating committee. In both 1983 and 1985, Judge Ford was nominated and elected president. In short, as to Judge Ford and Mr. Gordon, the reciprocal relationship of partiality and accommodation between the Probate Court context and the NEAVS context is clear, as is the violation by Judge Ford of Canon 3 (B) (4).

*Attorney George Himmel.*

During the years of Judge Ford's presidency of NEAVS, Attorney George Himmel served as a director of NEAVS, and,

---

[3] Attorney Ellis Brown was asked by Judge Ford to complete the work on the unfinished commissions. Mr. Brown did so, and divided the resulting fees with Mr. Gordon's estate. Mr. Brown, who had been a director of NEAVS, resigned that position shortly after Judge Ford asked him to complete the several commissions.

by appointment of Judge Ford, chairman of the NEAVS nominating committee for the year 1983. During 1979 through 1986, Mr. Himmel was appointed by Judge Ford in fifty-eight different probate matters, and received a total of $17,648 (all paid from estate funds) from these appointments. Mr. Himmel made no charge for his services in half of the fifty-eight matters assigned to him.

2. JUDGE FORD ENGAGED IN A BUSINESS, IN VIOLATION OF CANON 5.

The Code of Judicial Conduct limits a judge in his extra judicial activities. It is clear that Judge Ford violated certain provisions of Canon 5 in his activities with NEAVS. Although charitable activities are permitted to a judge, the circumstances here show that Judge Ford was engaged in the impermissible management of a business.

The relevant portions of Canons 4 and 5 of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 382 Mass. 814, 815 (1981), are, in pertinent parts, as follows. We have provided emphasis as to words that are significant in this case.

Canon 4 provides, in part: "A judge, subject to the proper performance of his judicial duties, may engage in the following quasi judicial activities, if in doing so he does not cast doubt on his capacity to decide impartially any issue that may come before him:

"(A) He may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice."

Canon 5 (B) provides, in part: "A judge may participate in civic and charitable activities that *do not reflect adversely upon his impartiality or interfere with the performance of his judicial duties. A judge may serve as an officer, director, trustee, or nonlegal advisor of* an educational, religious, *charitable*, fraternal, or civic *organization not conducted for the economic or political advantage of its members . . . ."*

Canon 5 (C) provides, in part: "(1) A judge should refrain from *financial and business dealings* that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial position, *or involve him in frequent trans-*

*actions with lawyers or persons likely to come before the court on which he serves.*"

"(2) Subject to the requirements of subsection (1), a judge may hold and manage investments, including real estate, and engage in other remunerative activity permitted by Canon 4, but should *not serve as an officer, director, manager, advisor, or employee of any business.*"

The principal purpose of NEAVS is to oppose and contest the use of animals in certain kinds of medical research. Judge Ford moved aggressively into the presidency of NEAVS, where he acquired the power to set goals and implement plans, and to hire staff, consultants, and attorneys. NEAVS is a charitable corporation chartered for charitable purposes. Its corporate purpose is not to further "the economic . . . advantage of its members" (Canon 5 [B], *supra*). However, as NEAVS's president, Judge Ford and others did conduct NEAVS's affairs in a manner designed to bring economic advantage to himself, his family, and his friends. Substantial sums of money for services rendered to NEAVS went to Judge Ford, to certain of his relatives, to Ms. Lisa Roberts and Mr. J. Michael Roberts, and to certain of their relatives.[4]

---

[4] Judge Ford hired on behalf of NEAVS his step-daughter, Janice L. Ford, his brother, Joseph Ford, three relatives of Lisa Roberts, and two of J. Michael Roberts's "in-laws." We recapitulate below the payments made to Judge Ford and certain individuals mentioned above, during the years of Judge Ford's tenure as president.

|  | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|---|---|
| Judge Ford |  |  | 18,333 | 20,000 | 29,375 | 35,000 | $102,708 |
| Lisa Roberts | 7,792 | 14,740 | 20,000 | 25,000 | 25,000 | 32,250 | $124,782 |
| J. Michael Roberts | 7,144/ 12,250 | (both shown as 1981) | 20,000 | 24,000 | 24,000 |  | $ 87,394 |
| Joseph Ford |  |  |  | 10,000 | 20,000 | 15,000 | $ 45,000 |

Additionally, in 1985, NEAVS contributed $4,406 to a qualified pension plan on behalf of Judge Ford and $3,750 on behalf of Ms. Roberts. In 1986, the total contributions for Judge Ford, Ms. Roberts, and NEAVS's other employees appear to have amounted to $12,500.

Undoubtedly, the many members and supporters of NEAVS in the community appropriately regard the organization as a charity, and not a business, but clearly Judge Ford, in his personal relationship with NEAVS, was, by his own planning and implementing, an officer, director, and manager of a *busiess*, in violation of Canon 5 (C) (2). In so doing, he also involved himself in dealings that brought him into frequent transactions with lawyers or persons likely to come before the court on which he served. We count in the record seven lawyers, including those identified in part 1 of this decision, who were involved with both NEAVS and the Norfolk County Probate and Family Court during Judge Ford's tenure as president of NEAVS. These dealings were in violation of Canon 5 (C) (1).

3. JUDGE FORD VIOLATED CANON 2 (A) IN SEVERAL RE-SPECTS.

Canon 2 (A) of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 382 Mass. 809 (1981), provides: "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Judge Ford clearly violated this canon in several respects, as shown below.

As a Massachusetts public charity, NEAVS files an annual report with the division of public charities within the office of the Attorney General. G. L. c. 12, § 8F (1986 ed). The annual report is filed by means of a sworn document supplied by that department and styled "Form PC." In addition to filing Form PC, NEAVS files annually a sworn Internal Revenue Service Form 990, "Return of Organization Exempt from Income Tax." Judge Ford signed Form PC and Form 990 on behalf of NEAVS for the years 1981 through 1985. The forms were prepared by outside accountants on the basis of information supplied by NEAVS employees. Form PC and Form 990 require NEAVS to report on the number of hours worked each week by its five highest compensated employees. The 1984 Form PC and Form 990 report Ms. Roberts working forty hours a week for NEAVS. The 1984 Form PC reports Judge Ford working thirty hours a week for NEAVS. Judge Ford signed the 1984 Form PC under oath on May 14, 1985.

Although the actual number of hours varied and is not ascertainable, Ms. Roberts did not work forty hours a week for NEAVS in 1984, nor did Judge Ford work thirty hours a week for NEAVS in 1984.

The Commission, in its report to this court, concluded that Judge Ford's explanation that he did not prepare the forms or examine them before signing them did not excuse his execution of the forms. The Commission concluded that the agreed facts support a conclusion that the figures sworn to by the judge, concededly incorrect, were material and wilfully false, in order, at least in part, to establish proof of eligibility for benefits under the qualified pension plan which NEAVS created for the benefit of Judge Ford, Ms. Roberts, and NEAVS's other employees.

We accept as true Judge Ford's statements that he signed the forms as part of his duties as president of NEAVS, that he did not prepare or examine them before signing them, that he relied on employees of NEAVS and independent accountants to prepare them accurately, that he did not intend the reports to be misleading, and that the forms and their contents were not intended to support any qualifications for the pension plan.

Even accepting Judge Ford's statements as true, the conclusions are compelling that the signing of the forms was a serious matter, and that Judge Ford should have known that he was swearing to false information. His conduct was in violation of Canon 2 (A), in that he did not conduct himself "in a manner that promotes public confidence in the integrity" of the judiciary.

Also, in his function in the administration of the court which he serves as first judge, Judge Ford's conduct tended to shake public confidence in the integrity of the judiciary, again in violation of Canon 2 (A). In his direction of the operation of NEAVS, Judge Ford involved a number of the employees of the Norfolk County Probate and Family Court. Part 1 of this decision discusses the judge's promotion in NEAVS of the interests of the first assistant register, Ms. Lisa Roberts. In addition to Ms. Roberts, Judge Ford, from time to time, hired several other Norfolk County Probate and Family Court em-

ployees, including an assistant register, two secretaries, a court officer, and an assistant to the register, for various part-time tasks. NEAVS also employed for a period of time, as a part-time bookkeeper, the wife of an assistant register.

A flagrantly adverse reflection on the integrity of the judiciary arose from the involvement with NEAVS of a number of employees of the Probate and Family Court in Norfolk County on a day when Judge Ford was involved in a contest for election as vice president of the organization. The 1981 NEAVS annual meeting was held at the Copley Plaza Hotel in Boston from approximately 2 P.M. to 4 P.M., on Friday, January 23, during normal court hours on a day when the court was in session. Approximately fifteen to seventeen court employees were transported to that meeting in a bus hired by court employee John Scott on his own initiative. None of the court employees who attended the annual meeting was a NEAVS member prior to the meeting, and all were first enrolled at the meeting. They left the courthouse in the early afternoon and returned late in the afternoon, after the close of the court's business day. The result of the election for NEAVS vice president was 150 votes for Judge Ford and seventy-one votes for his opponent.

Judge Ford knew of the court employees' intended absence, and he approved of the absences, but only if the employees took personal or vacation time and secured the approval of their supervisors. The judge requested and verified that all court employees attending the annual meeting took either a vacation or personal day. The judge reimbursed John Scott for the cost of the bus.

4. MITIGATING FACTORS.

We have shown the egregious conduct of Judge Ford, and now, in considering an appropriate disposition of the matter, we take into account certain mitigating factors established in the record. Thus, in the preliminary portion of this decision we summarize, from the record forwarded to us by the Commission, that NEAVS progressed and advanced under the judge's direction; that the judge performed his full share of judicial and administrative duties at the Norfolk County Probate

and Family Court promptly and efficiently; and that the judge's NEAVS-related activities did not interfere with his judicial duties. The record also states that, as to Ms. Lisa Roberts, her employment with NEAVS did not interfere with the performance of her duties as assistant register of the court.[5] There is no evidence that Judge Ford and the several other persons who, by his assistance, received compensation from NEAVS, did not earn the money they received. We draw no inference, one way or the other, as to that issue.

Judge Ford has been a judge since 1967, and has had a good reputation as a jurist. Aside from the lengthy course of misconduct shown in this decision, we have no knowledge of any other judicial misconduct on his part.

5. CONCLUSION.

We conclude that it is appropriate that Judge Ford be publicly censured, as recommended by the Commission. Further, because much of his misconduct concerned his administrative duties, we conclude that he should be suspended from administrative functions. A single justice of this court will resolve any questions that may arise in identifying Judge Ford's administrative functions, as distinguished from his judicial functions. Finally, because investigation of this matter over a period of many months has occupied considerable time and effort of a number of persons, including the Commission on Judicial Conduct and its special counsel, staff persons of this court, and a special master and commissioner appointed by this court, we think it requisite that costs be assessed against the judge in a substantial amount. We consider these several measures an adequate disciplinary result, although we are mindful of the prerogatives of the executive and legislative branches under the Massachusetts Constitution.

Judge Ford, by reason of his misconduct, is herewith censured. He shall continue to exercise his judicial functions, but he is suspended, until further order of this court, from all administrative duties and prerogatives which attach to his posi-

---

[5] Ms. Roberts resigned her position as first assistant register of probate in 1988.

tion as judge and first judge of the Probate and Family Court in Norfolk County. Judge Ford is to pay to the Commonwealth of Massachusetts, through the Clerk of the Supreme Judicial Court for the Commonwealth, on or before October 1, 1989, the sum of $75,000 in costs.

*So ordered.*