## IN THE MATTER OF PAUL H. KING.

Suffolk. February 27, 1991. - March 26, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Judge. Commission on Judicial Conduct. Statute, Retroactive effect.*

Certain complaints alleging misconduct by a judge, filed by the Commission on Judicial Conduct on its own initiative, conformed to the requirements of G. L. c. 211C and were properly before this court. [596-598]

A notice of formal proceedings in relation to an inquiry by the Commission on Judicial Conduct fulfilled the requirements of G. L. c. 211C, § 2, and the commission's rules. [598]

Where complaints against a judge were filed by the Commission on Judicial Conduct prior to the effective date of St. 1987, c. 686, § 1, amending G. L. c. 211C, the standard of proof applicable to the proceeding was the "fair preponderance of the evidence" standard [599-600], and the hearing officer was not obliged to observe the rules of evidence [600].

In a proceeding by the Commission on Judicial Conduct, it was appropriate for the hearing officer to consider the testimony of an assistant clerk of court concerning the circumstances of a remark made by the judge after certain bail hearings, which tended to show that the bail decisions were made for improper reasons. [601]

A judge's alleged bail practices were an appropriate matter for inquiry in a proceeding by the Commission on Judicial Conduct, and the hearing officer properly concluded, as matter of law, that the alleged practices were unauthorized by law and were contrary to accepted practice. [601-603]

The jurisdiction of the Commission on Judicial Conduct is not limited only to misconduct directly prejudicial to the judicial function or the administration of justice. [603-604]

In a proceeding by the Commission on Judicial Conduct, the evidence before the hearing officer, whose conclusions were adopted by the commission, was sufficient to support his findings (a) that the judge had engaged in a pattern of making derogatory and obscene references to members of the bench and bar, in violation of Canons 1, 2 (A), and 5 (A) of the Code of Judicial Conduct [604-605]; (b) that the judge had engaged in a pattern of drinking to excess in public and then urinating in public, in violation of Canons 1 and 2 (A) [605]; (c) that the judge

was less than candid and forthright in his testimony before a special master and commissioner of this court, in violation of Canon 1 [605-606]; (d) that, shortly after learning that large numbers of black voters in Boston voted for his brother's opponent in the 1982 gubernatorial primary election, the judge set unusually high bail for four black defendants appearing before him, in violation of Canons 1, 2 (A), and 2 (B) [606-607]; and (e) that the judge maintained a practice of confiscating without adequate notice the cash alternative bail funds deposited by friends and relatives of nondefaulting defendants to satisfy outstanding obligations of the defendants, in violation of Canons 2 (A) and 3 (A) (1) [607-608].

Where the Commission on Judicial Conduct, in proceedings against a judge, established five distinct charges and violations of four canons of the Code of Judicial Conduct, this court, after considering certain mitigating and aggravating factors, concluded that the judge should be publicly censured and permanently enjoined from sitting in the division of the District Court Department to which he had been appointed. [608-610]

PROCEEDING in relation to an inquiry concerning a judge, commenced in this court on December 8, 1986.

The matter was submitted on the record of proceedings before the Commission on Judicial Conduct.

*Paul B. Galvani*, Special Counsel, for the Commission on Judicial Conduct.

*Francis E. Dooley, Jr., & Paul M. Moretti* for Paul H. King.

BY THE COURT. We consider in this matter what disposition we shall enter as a result of a report and recommendations concerning Judge Paul H. King (Judge) by the Commission on Judicial Conduct (Commission).

The case has a lengthy background which we summarize as follows. On November 13, 1986, The Boston Globe newspaper published an article concerning the Judge, who was at that time the First Justice of the Dorchester Division of the District Court Department, based on an interview that he had given to the reporter. The article suggested that the Judge had mishandled a spousal abuse matter, and repeated remarks the Judge had made that indicated that he consid-

ered the directives of his administrative superiors unimportant. That day, in response to the column, the Administrative Justice of the District Court Department reassigned the Judge to the Stoughton District Court and limited him to hearing certain types of civil cases only.

The Commission also reacted to the Globe article. On November 25, 1986, on its own motion, the Commission filed complaint no. 86-90, charging the Judge with violations of several canons of the Code of Judicial Conduct in his handling of, and comments on, spousal abuse petitions. This proceeding was followed by an order of this court (on December 8, 1986) appointing a special master and commissioner (commissioner). The commissioner was ordered to investigate the practices and procedures of the Dorchester District Court and to provide a full and prompt report to this court. After interviewing over 100 witnesses, the commissioner submitted his report. It consisted of numerous findings relative to the Judge's conduct (both on and off the bench), concluded that the Judge appeared to have violated several canons of the Code of Judicial Conduct, and recommended that the Commission institute formal proceedings against him.

On April 8, 1987, counsel for the Judge appeared before the full bench of this court and proposed that the issues raised in the commissioner's report be resolved by the court's acceptance of the Judge's permanent relinquishment of his statutory status and responsibilities as First Justice of the Dorchester District Court, see G. L. c. 218, § 6, fourth par. (1988 ed.), and his reassignment to another court. We accepted this proposal and, on May 1, 1987, issued an order providing that the Judge's relinquishment of his status and responsibilities as First Justice of the Dorchester District Court was accepted, and that the Judge could continue to accept assignments to other divisions of the District Court.

On May 28, 1987, again on its own motion, the Commission filed complaint no. 87-56. This complaint incorporated complaint no. 86-90, and the facts and information contained in the Commissioner's report. The complaint also made the new charge that the Judge's performance as a judge might

be impaired by the use of medication or the abuse of alcohol, or both. In July, 1987, special counsel was appointed to investigate the allegations in complaints no. 86-90 and no. 87-56.

Special counsel began an extensive inquiry. In the process, he obtained evidence of additional potential improprieties in the Judge's conduct that had not been covered in the commissioner's report or the complaints. Therefore, the Commission on March 24, 1988, filed a supplemental complaint to complaint no. 87-56. This supplemental complaint set forth additional allegations against the Judge as follows: (1) in 1982, the Judge imposed unusually high bail on four black defendants in retaliation for the overwhelming rejection of his brother (former Governor Edward J. King) by black voters during a recent gubernatorial primary election; (2) throughout the 1980's, the Judge openly and regularly fraternized with a Dorchester attorney whom he was contemporaneously appointing to represent numerous defendants; (3) the Judge systematically and without notice confiscated bail money posted by friends and relatives of nondefaulting defendants and applied it to court costs and other obligations of those defendants; (4) the Judge was publicly intoxicated at a December, 1986, retirement party for two court officers; (5) the Judge regularly and openly urinated in public view in the parking lot of a Dorchester restaurant; (6) the Judge drove his car onto Dorchester Avenue after becoming intoxicated and urinating beside his car; and (7) on a public street, the Judge offered wine to a woman who appeared to be a prostitute.

Special counsel's investigation continued. In May, 1988, during the course of the Judge's deposition, a dispute arose over the scope of the Commission's inquiry in light of this court's May 1, 1987, order concerning the commissioner's report. The Judge refused to testify about matters that he considered encompassed by the commissioner's report and the resolution of those charges by this court. Special counsel moved for an order compelling the Judge's testimony. The single justice reported the question to the full court. On Oc-

tober 20, 1988, we directed that the Judge submit to a deposition and also specified which allegations remained open and subject to further inquiry, and which allegations were beyond the scope of the Commission's inquiry. The order of October 20 was referenced to a request by special counsel which identified the areas he wished to investigate by specific subject matter, and the order defined the topics that could be the subject of further inquiry.[1]

On March 20, 1989, the Commission issued a notice of formal proceedings, making eleven charges against the Judge. Four of these charges and parts of others, in our opinion, are beyond the scope of the inquiry as defined by the court's order of October 20.[2] In addition, the Commission

---

[1]In the October 20 order we clarified that the following allegations were appropriate for further inquiry: (1) the Judge gave false and misleading testimony to the commissioner regarding his activities with local attorneys at a Dorchester restaurant; (2) the Judge in 1982 intentionally imposed excessive bail on four black defendants in retaliation for the overwhelming rejection of his brother (former Governor Edward J. King) by black voters during a recent gubernatorial primary election; (3) the Judge systematically and without notice confiscated bail money posted by the friends and relatives of nondefaulting defendants; (4) the Judge became publicly intoxicated on several occasions while drinking at a Dorchester restaurant and at court-related social events; (5) the Judge regularly and openly urinated in public view in the parking lot of a Dorchester restaurant; (6) the Judge drove his car onto Dorchester Avenue after becoming intoxicated, in violation of G. L. c. 90, § 24 (1988 ed.); (7) the Judge stated in a published interview with a Boston Globe reporter that he was free to run his courtroom and interpret the laws of the Commonwealth as he saw fit, without interference from his superiors; (8) the Judge's performance might be impaired by the use of medication, the abuse of alcohol, or both; (9) the Judge at public gatherings made derogatory references to members of the bench and bar; and (10) the Judge intentionally drove his car through red traffic lights at intersections in Dorchester.

[2]These charges were as follows: (1) the Judge fraternized with appointed counsel at a Dorchester restaurant; (2) the Judge fraternized with an attorney whom he frequently appointed to represent indigent defendants; (3) the Judge at a court Christmas party called a young female court employee a "bitch," engaged in a vituperative conversation with a probation officer, and had to be restrained from fighting the same officer; (4) the Judge in a Roxbury tavern challenged a probation officer to fight; (5) the Judge presided over the drunk driving trial of the daughter of a friend of his brother; (6) the Judge regularly behaved abusively in the courtroom; and (7) the Judge regularly behaved indecorously in the courthouse. As

also omitted from the notice of formal proceedings three charges that it considered unsupported by the evidence.[3] Pursuant to a request by the Commission, we appointed a retired judge of the Superior Court as hearing officer (hearing officer) to conduct an evidentiary hearing on the charges.[4] After an eighteen-day hearing at which fifty-one witnesses testified, the hearing officer submitted to the Commission his findings of fact, conclusions of law, and recommendations.[5]

The Commission then issued to the court its report and recommendations. The Commission accepted and adopted all of the hearing officer's findings and his conclusion that the Judge had violated several separate canons of the Code of Judicial Conduct. Based on this conclusion, the Commission recommended the following sanctions: a public censure, a $25,000 fine, a permanent injunction barring the Judge from either sitting in Dorchester District Court or hearing criminal and juvenile cases, a public apology, and the public release of its report and appendices.

As this chronology confirms, this inquiry has a long and complicated procedural history. Numerous charges have been leveled against the Judge at several points during the course of the inquiry. A number of these charges were addressed by

has been indicated, the order of October 20 sought to define what areas could be examined by special counsel to the Commission and what matters had been disposed of by our order of May 1, 1987, removing the Judge as First Justice.

[3]These charges were as follows: (1) the Judge was mishandling spousal abuse petitions; (2) the Judge's performance as a judge might be impaired by the use of medication, the abuse of alcohol, or both; and (3) the Judge on a public street offered wine to a woman who apparently was a prostitute.

[4]In his appointment letter to the hearing officer, the Chief Justice noted: "Since the complaints against Judge King were filed prior to the most recent amendments to G. L. c. 211C, the hearing will proceed, especially with respect to confidentiality, according to the earlier version of G. L. c. 211C and the Rules adopted pursuant thereto."

[5]The hearing officer concluded that the Judge's remarks in the Globe interview and his running of red lights were not violative of any of the canons of the Code of Judicial Conduct. He also found insufficient evidence that the Judge drove while intoxicated in violation of G. L. c. 90, § 24. The Commission accepted and adopted these conclusions.

the May 1, 1987, order; others were winnowed out during the investigation and formal proceedings phases of the inquiry. For the sake of clarity, we itemize the charges that remain open and subject to our review: (1) the Judge made derogatory and obscene references to members of the bench and bar (notice of formal proceedings, third charge); (2) the Judge frequently became intoxicated in public, and openly urinated in public (notice of formal proceedings, fourth charge); (3) the Judge was less than candid and forthright before the commissioner (notice of formal proceedings, fifth charge); (4) the Judge in 1982 set excessively high bail for four black defendants in retaliation for the overwhelming rejection of his brother (who was then Governor) by black voters in the gubernatorial primary election (notice of formal proceedings, sixth charge); and (5) the Judge systematically and without notice confiscated bail money posted by friends and relatives of nondefaulting defendants and applied it to court costs and other obligations of defendants (notice of formal proceedings, seventh through ninth charges). To evaluate these charges, we have before us the commissioner's report, the transcript of the proceedings before the hearing officer and his report, the Commission's report and documentary appendix, and the Judge's lengthy and detailed response and appendix.

1. *Preliminary issues.* We first consider and decide several preliminary issues raised by the Judge.

a. *The complaints.* The Judge contends that, for various reasons, the three complaints failed to conform to the requirements of G. L. c. 211C, and therefore must be dismissed. Specifically, he argues: (1) complaints no. 86-90 and no. 87-56 lacked specificity and reliability; (2) the complaints no. 86-90 and no. 87-56 refer to matters that already are resolved or otherwise closed; and (3) supplemental complaint no. 87-56 in fact is an independent complaint filed more than one year after the last allegedly violative acts to which it refers. We reject these arguments.

First, we have examined complaints no. 86-90 and no. 87-56 against the standards articulated in *McKenney* v. *Commission on Judicial Conduct*, 377 Mass. 790, 801-802

(1979), and in relation to the nature of the complaint that we found insufficient there. The complaints here clearly satisfy the *McKenney* standards and were more than sufficient to permit the Judge reasonably to respond.

Second, the fact that complaints no. 86-90 and no. 87-56 refer to matters that are not presently before us does not require their dismissal. The court's May 1, 1987, order disposing of the allegations made by the commissioner merely rendered unnecessary our reexamination of those charges now. That order by its terms did not purport to preclude further action by the Commission. The Commission as a separate statutorily created body (see *McKenney* v. *Commission on Judicial Conduct, supra* at 794) was free to continue its investigation of the Judge in accordance with its statutory mandate. Consistent with this interpretation of the May 1 order, the court appointed special counsel to conduct a further investigation on behalf of the Commission *subsequent* to the order and the filing of complaint no. 87-56.

In addition, in its October 20, 1988, order clarifying the scope of the inquiry in light of the order of May 1, 1987, the court specified for special counsel exactly what allegations were subject to further investigation, and which were beyond the scope of the inquiry. The order of October 20 authorized special counsel to continue an investigation that had commenced with complaint no. 86-90 and had expanded to include the allegations in complaint no. 87-56 and its supplemental complaint. The order of October 20 was based on the assumption that this investigation was ongoing and had not been preempted by the May 1, 1987, order. The order of May 1 therefore did not have the effect of nullifying or vacating complaints no. 86-90 and no. 87-56.

Nor is the fact that other charges from the complaints have since been dropped from the inquiry (see notes 3 and 5, *supra*) material to the validity of the complaints. The purpose of the investigation and formal proceedings is to determine whether there is sufficient evidence to support the allegations of misconduct made in the complaints. Commission complaints are not rendered nugatory after the fact simply

because an investigation uncovers insufficient evidence to support every allegation they contain.

Third, and finally, we conclude that, contrary to the Judge's contention, supplemental complaint no. 87-56 is not a new and independent complaint. It is expressly dependent on, and supplemental to, the original complaint, and therefore relates back to the date of the original. The three complaints address, for the most part, incidents that form a pattern of conduct. Accordingly, supplemental complaint no. 87-56 does not transgress the statutory provision requiring that the Commission not deal with complaints arising out of acts occurring more than one year before the date of the complaint. See G. L. c. 211C, § 2 (1986 ed.). Nothing else of merit is argued with regard to the adequacy of the complaints.

b. *The notice of formal proceedings.* The Judge challenges the notice of formal proceedings. He argues in essence that the notice of formal proceedings must be dismissed because each of the eleven charges it made was not part of a complaint that issued within one year of the events that prompted the complaint, as required by G. L. c. 211C, § 2 (1986 ed.). Obviously, the success of this argument depends on our response to the Judge's arguments regarding the complaints, because, with one exception, complaints no. 86-90 and no. 87-56 both arose from conduct, or patterns of recurring conduct, found to have run through December, 1986, well within one year of each complaint.[6] Because we have concluded that the Judge's claims regarding the complaints fail, his claims in this context must fail as well.[7]

---

[6]The exception that we refer to is a 1982 incident in which the Judge allegedly ordered excessively high bail for four black defendants in retaliation for the overwhelming rejection of his brother (the former Governor) by black voters in the 1982 gubernatorial primary election. The Commission expressly found "good cause" to address this charge, so the one-year requirement is inapplicable. See G. L. c. 211C, § 2 (1986 ed.).

[7]We are not persuaded by the Judge's related argument that the notice of formal proceedings must be dismissed because some of the charges were not made in any complaint and appeared for the first time in the notice of formal proceedings, thus depriving the Judge of notice. These charges were

c. *Standard of proof.* By St. 1987, c. 656, § 1 (approved Jan. 4, 1988), the Legislature rewrote G. L. c. 211C. Among other things, where the earlier version of G. L. c. 211C had been silent, the new statute provides that the Commission shall have the burden of proving any charges by clear and convincing evidence. G. L. c. 211C, § 7 (4) (1988 ed.). The Judge argues that this standard should apply in this inquiry, rather than the fair preponderance standard applied by the hearing officer.

In his letter appointing the hearing officer, the Chief Justice of this court stated that the earlier version of c. 211C controlled, because the complaints against the Judge were filed prior to the amendment of the statute. The Chief Justice's statement was correct, and we adopt it in full.

This inquiry was commenced in 1986 with the filing of Commission complaint no. 86-90. After investigation uncovered additional evidence, complaint no. 87-56 was filed in 1987. This complaint later was supplemented. At the earliest, the sections of the new version of the statute on which the Judge relies became effective on February 3, 1988. Thus, these proceedings were commenced months before the effective date of the new statute. The former version of the statute controls this inquiry. Cf. Scope and Title, Rules of the Commission on Judicial Conduct (1991) ("Any proceedings initiated prior to April 1, 1988, shall be governed by the rules which were in effect under Chapter 211C before April 1, 1988").[8]

---

based on evidence that the special counsel uncovered after complaints no. 86-90 and no. 87-56 were filed, and during the course of his investigation. In these circumstances, the Commission was not required to detail every new charge in another complaint. Whether to do so was discretionary under former Rule 11 (b) of the Rules of the Commission on Judicial Conduct (1987), which provided in part that "the Commission *may* cause said complaint to be amended, or a supplementary complaint to be issued" (emphasis added). The fact that the Commission in its discretion chose not to issue such a complaint does not warrant dismissal of the notice of formal proceedings.

[8]We reject the Judge's contention that the new c. 211C is merely a procedural statute that applies retroactively. The new statute constitutes a comprehensive scheme relating to the establishment and functions of the

Having drawn this conclusion, the remaining question concerns the standard of proof applicable under the earlier version of c. 211C. We agree with the hearing officer that, under *Matter of Bonin*, 375 Mass. 680, 690 (1978), the Commission could carry its burden of proof with a fair preponderance of the evidence. Accordingly, we shall evaluate the evidence introduced against the Judge here under this standard.

d. *Rules of evidence.* The new c. 211C also provides that the rules of evidence apply to Commission proceedings. The Judge argues that the new statute applies, and, therefore, the hearing officer was obliged to observe the rules of evidence. We have concluded above, however, that the new c. 211C does *not* apply. The hearing officer was not required by the applicable version of c. 211C (or by Commission rules) to observe the rules of evidence. In addition, we note below that the Judge's principal arguments on points of evidence are also lacking in merit.[9]

e. *The hearing officer's legal conclusions.* The Judge challenges a number of the hearing officer's findings as based on "erroneous conclusions of law." We consider those arguments relating to charges that presently remain open.

---

Commission. It is unlike the purely procedural statutes in the cases relied on by the Judge. Contrast *Lapinsky's Case*, 325 Mass. 13 (1949); *Goddu's Case*, 323 Mass. 397 (1948); *Smith* v. *Freedman*, 268 Mass. 38 (1929). Nor is there any indication in the new statute that it was intended to operate retroactively. See *Hein-Werner Corp.* v. *Jackson Indus., Inc.*, 364 Mass. 523, 525 (1974). Accordingly, the statute operates prospectively.

[9]The Judge argues that the hearing officer's report is fundamentally flawed because: (1) the hearing officer erroneously admitted testimonial evidence concerning a court proceeding; and (2) the hearing officer erroneously admitted "numerous so-called inconsistent statements so that it is impossible to ascertain the extent to which he used such statements substantively." Regarding the first argument, we consider it later and conclude that the disputed testimony was not inadmissible under the principles of the cases relied on by the Judge. As to the second argument, the Judge does not even raise it in relation to any of the five charges now before us. Thus, the Judge has not persuaded us that the hearing officer's decision not to follow formal rules of evidence could have made any meaningful difference to his findings and conclusions.

*i. The excessive bail incident.* The hearing officer found that, soon after his brother lost the 1982 gubernatorial primary election to Michael S. Dukakis (and after The Boston Globe had reported that black voters in Boston voted for Dukakis in high numbers), the Judge set unusually high bail for four black defendants, and afterward said to an assistant clerk: "That's what blacks get for voting against my brother." The Judge claims that the hearing officer erroneously admitted and credited the assistant clerk's testimony concerning the incident. Citing a number of cases in support of the proposition that, in some circumstances, court proceedings can only be proved by authentic court records, the Judge contends that the hearing officer should not have admitted the testimony of the assistant clerk.

The precedents relied on by the Judge are beside the point. The assistant clerk testified that a Boston Globe article reported that black voters in Boston overwhelmingly voted for Governor King's opponent. He further testified that, before the bail hearings, he mentioned the article to the Judge, who said that he had read it. He stated that, after the bail hearings, the Judge made the remark quoted above. Thus, in contrast with the cases cited by the Judge, the court proceedings here were not, per se, the issue. The circumstances attending those proceedings were the issue, specifically the fact that the bail decisions were for improper reasons. The evidence of those circumstances was independently admissible and, if credible, sufficient to support a finding of misconduct without evidence of the court proceedings. There was no error in the admission of the assistant clerk's testimony.

The Judge also argues that his decisions in connection with these bail hearings (particularly as the defendants all were represented by counsel) are inappropriate for consideration by the Commission because they were based on the exercise of his legal judgment and reviewable on appeal. The Judge is correct that, generally, judges are immune from sanctions based solely on appealable errors of law or abuses of discretion. See *Matter of Troy*, 364 Mass. 15, 40 (1973). This is not an unqualified proposition, however; we will impose sanc-

tions upon judges who utterly disregard law and established rules of practice in the face of contrary orders. See *id*. at 40-41. In this case, the implication of the Judge's argument is that a judge can make a single judicial decision for expressly racist and vindictive reasons and, so long as he does not make a habit of it, neither the Commission nor this court (outside of the usual avenues of appeal) can respond to that action. That is an implication that we will not countenance. It may be that the defendants in these cases had valid grounds on which to challenge the Judge's decisions as to the amount of bail. It does not follow, however, that there was no judicial misconduct in the Judge's setting the amount of their bail. The principles articulated in *Matter of Troy, supra*, were no bar to the Commission's consideration of this charge.

*ii. The practice of confiscating bail money.* The hearing officer found that the Judge, as a matter of policy, listed all cash alternative bail money received at the Dorchester District Court from friends and relatives of defendants under the defendant's name. He then would use the money to satisfy the defendant's obligations, even though they may have arisen out of cases unrelated to the one in connection with which the money had been deposited, and even though the defendant did not default in the case in connection with which the money had been deposited. The Judge argues here, in essence, that this practice was not contrary to law or accepted rules of practice, and therefore the hearing officer erred in not dismissing these charges.

In his report, the hearing officer conducted a detailed analysis of the Judge's bail practices. We agree with his legal conclusion that the Judge's bail practices were not authorized by law and were contrary to prescribed practice. The Judge's policies were in violation of the intent of G. L. c. 276, §§ 57 and 68 (1988 ed.), which recognize a surety's right to post cash bail and require that it be returned in cases where the defendant does not default. In particular, the practice of using (without specific notice) a surety's cash alternative funds posted in one case to secure or satisfy the defendant's obligation in another case is "shocking and not to be

countenanced in a civilized society." See *United States* v. *Davis*, 47 F. Supp. 176, 177 (S.D.N.Y. 1942), aff'd, 135 F.2d 1013 (2d Cir. 1943). The practice is not authorized by any authority that we can locate, and is simply unfair, if not unconstitutional.

The Judge again points out that his policies and practices in connection with bail were based on the exercise of his legal judgment. Because such judgments are reviewable on appeal, he argues, they should not be the basis for discipline in these proceedings. As we have noted above, if it is shown that a judge has disregarded law and established rules of practice over a protracted period and in the face of contrary orders, there is a basis for the imposition of discipline. See *Matter of Troy*, *supra* at 40-41. As the question whether the Judge's conduct rose to that level involves an evaluation of a finding of fact, however, we shall address it later in this opinion when we consider the Judge's other challenges to the facts found in this inquiry.

f. *The Commission's jurisdiction.* The Judge argues that the Commission's jurisdiction does not extend to matters not found to be prejudicial to the administration of justice. Therefore, he contends, all charges not relating to the performance of his judicial duties must be dismissed.

We decline to dismiss them. In a number of cases, we have imposed sanctions recommended by the Commission based on misconduct on the part of judges that was not directly related or prejudicial to the performance of their judicial duties or the administration of justice. See, e.g., *Matter of Ford*, 404 Mass. 347, 354-355 (1989) (negligent swearing to false information in connection with personal activity); *Matter of Killam*, 388 Mass. 619, 622-623 (1983) (operating motor vehicle while under the influence of intoxicating liquor); *Matter of McKenney*, 384 Mass. 76, 90-92 (1981) (improper purchase and registration of motor vehicle so as to reduce purchase price and sales tax liability); Cf. *Matter of Larkin*, 368 Mass. 87, 91-92 (1975) (attempted campaign contribution to Governor); *Matter of Troy*, 364 Mass. 15, 41-46 (1973) (violation of terms of license governing real es-

tate development project). Thus, the Commission's jurisdiction is not limited only to misconduct directly prejudicial to the judicial function or the administration of justice.

2. *Sufficiency of the evidence.* The Judge here argues that the hearing officer's findings are unsupported by the facts and unwarranted by the evidence. We discuss this contention in relation to each of the five remaining charges.

a. *Derogatory and obscene references to members of the bench and bar.* The Commission accepted and adopted the hearing officer's conclusion that the Judge engaged in a pattern of making derogatory and obscene references to members of the bench and bar in violation of Canons 1, 2 (A), and 5 (A) of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 382 Mass. 808, 809, 814 (1980). Canon 1 provides: "A Judge should uphold the integrity and independence of the judiciary." The comment to this canon provides in part: "A Judge should . . . himself observe[ ] high standards of conduct . . .." Canon 2 (A) provides: "A Judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 5 (A) provides in part: "A Judge may . . . engage in . . . social and recreational activities, if such avocational activities do not detract from the dignity of his office . . .."

The hearing officer found that from the 1970's through 1986, after the workday and roughly several times monthly, the Judge frequented a particular Dorchester restaurant, and associated there with a select group of local attorneys. Well into 1986, the Judge's conversation at these gatherings was peppered with obscenities, profanities, and crude comments about judges in other courts and the judges serving with him in the Dorchester District Court. The exact statements made are set forth in the Commission's report and need not be repeated or commented upon here except for the observation that they are tasteless and ill-befitting a judicial officer.

The Judge challenges the Commission's conclusions by pointing to contrary evidence and by generally arguing that the evidence was insufficient and did not reveal a pattern.

The hearing officer was not required to accept the contrary evidence. We agree with the Commission that the evidence was sufficient and that it demonstrated a pattern. We conclude that the evidence established that the Judge violated Canons 1, 2 (A), and 5 (A).

b. *Public intoxication and urination.* The Commission accepted and adopted the hearing officer's conclusion that the Judge engaged in a pattern of drinking to excess in public and then urinating in public in violation of Canons 1 and 2 (A). We summarize the hearing officer's findings. From the 1970's through 1986, the Judge on various occasions (often at the Dorchester restaurant) became visibly intoxicated in the presence of attorneys and court personnel. Witnesses testified that, on these occasions, the Judge became "tipsy," "agitated," experienced a change of personality, and spoke with slurred speech. On at least one occasion, the Judge appeared so intoxicated that one observer offered to drive him home. On a number of these occasions, the Judge urinated in the parking lot of the restaurant, seemingly unconcerned about the presence of witnesses, or the proximity of the parking lot to a main road and a public baseball field. On one occasion in particular, the Judge urinated in view of a restaurant cook and his wife.

The Judge attacks the Commission's conclusions again by arguing that the evidence was insufficient and contradictory. The inferences drawn by the hearing officer were justified by the evidence. The hearing officer was not required to credit all the contradictory evidence relied on by the Judge. We conclude that the evidence established that the Judge violated Canons 1 and 2 (A).

c. *Lack of candor in testimony before the commissioner.* The Commission accepted and adopted the hearing officer's conclusion that the Judge was less than candid and forthright in his testimony before the commissioner, in violation of Canon 1. We summarize the hearing officer's findings. The conversations at the restaurant (as the foregoing discussion implies) often were "loud and bibulous," and did not relate to court business; "[i]n fact, the gatherings and the conversa-

tions were primarily and almost exclusively social in purpose and function, leaving legal matters, even in the broadest sense of that term, secondary, subordinate, and incidental." According to the hearing officer, however, in response to a question by the commissioner, the Judge stated that the group "basically always [discussed] business," but occasionally discussed hockey. There also was evidence that the Judge repeated for the commissioner a conversation (regarding his activities at the restaurant) with Judge Dolan in a manner significantly different from Judge Dolan's memory of the conversation.

The Judge argues that his testimony was truthful and not misleading, and that the charge therefore was not proved. We agree that (as the hearing officer found) there was insufficient evidence that the Judge intended to mislead the commissioner, or that the commissioner actually was misled. There was sufficient evidence, however, to support the conclusion that the Judge was less than forthcoming with the commissioner. The Judge was under an obligation to be "completely candid" with the commissioner. See *Matter of Cunningham*, 517 Pa. 417, 444 (1988); *Matter of Gelfand*, 70 N.Y.2d 211, 214-216 (1987). See also *Matter of Bonin*, 375 Mass. 680, 708-709 n.6 (1978) (noting that judges "must adhere to standards of probity . . . higher than those deemed acceptable for others"); *Matter of Troy*, 364 Mass. 15, 45-46 (1973) (noting that judge was not "forthright" in his testimony). The evidence was clear that he was less than completely candid. We conclude that the evidence established that the Judge violated Canon 1.

d. *Setting of high bail for black defendants.* The Commission accepted and adopted the hearing officer's conclusion that, shortly after learning that large numbers of black voters in Boston voted for Governor King's opponent in the 1982 gubernatorial primary election, the Judge set unusually high bail for four black defendants appearing before him, in violation of Canons 1, 2 (A), and 2 (B). Canons 1 and 2 (A) are quoted above. Canon 2 (B) of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 382 Mass. 809 (1981), pro-

vides in part: "A judge should not allow his family . . . relationships to influence his judicial conduct or judgment."

The evidence in support of this charge has been summarized above. In essence, it consisted of the testimony of the assistant clerk who was present, and a copy of a Boston Globe article reporting that many black voters in Boston voted for Governor King's opponent in the 1982 primary election.

The Judge here reiterates the argument that the assistant clerk's testimony was inadmissable. We already have rejected this argument. The Judge also emphasizes that he denied this charge. Again, however, the hearing officer was not required to accept the Judge's testimony. We conclude that there was sufficient evidence that the Judge violated Canons 1, 2 (A), and 2 (B).

e. *Improper bail procedures.* The Commission accepted and adopted the hearing officer's conclusion that the Judge maintained a practice of confiscating without adequate notice the cash alternative bail funds of friends and relatives of non-defaulting defendants to satisfy outstanding obligations of the defendants, sometimes even obligations arising from other cases, in violation of Canons 2 (A), and 3 (A) (1). Canon 2 (A) is quoted above; Canon 3 (A) (1) of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 382 Mass. 808 (1981), provides in part: "A judge should be faithful to the law and maintain professional competence in it."

We summarize the hearing officer's findings. Under the Judge's bail policy, any cash alternative bail funds received from friends or relatives of a defendant appearing at the court were listed under the defendant's name. Although notice was given of this filing practice, those posting bail were not advised that their funds would be used to satisfy other obligations of the defendant (even those incurred in other cases) regardless of whether the defendant did not default and made the appearance that the funds were submitted to guarantee. These funds then would be applied to a defendant's outstanding obligations, including support payments, le-

gal fees for marginally indigent defendants, and court costs. These obligations often arose from cases other than those in connection with which the cash alternative funds were deposited. Persons depositing funds that were applied in this way generally did not find out about what had happened until the matter had concluded and they did not receive their deposits. In such cases, they often complained to the court clerks and even to the Judge himself. Sometimes their funds were returned; sometimes they were not returned.

The Judge received warnings from several quarters that this practice was unauthorized by law and inappropriate. For example, a clerk-magistrate of the court advised the Judge that, in his opinion, using bail money for any purpose other than insuring recognizance was illegal. The Judge replied that he would do things his way. The Chief Administrative Justice of the Trial Court informed the Judge by letter to follow published guidelines in the handling of bail. The senior internal auditor in the Chief Administrative Justice's office later spoke with the Judge in person and told him that his bail policies were inappropriate. The Judge responded that, in his experience, his policies ensured the collection of money that defendants otherwise would not pay voluntarily, so he would continue the practice.

The Judge here repeats the argument that the hearing officer was wrong as a matter of law in concluding that the Judge's bail policies were unauthorized and contrary to sound bail procedures. We already have rejected this argument. There was ample evidence that the Judge disregarded law and established rules of practice in the face of contrary expressions of opinion and repeated directives from the office of his administrative superior. This case involves more than just good faith errors of judgment or abuses of discretion that can be corrected on appeal. See *Matter of Troy, supra* at 40. We conclude that there was sufficient evidence that the Judge violated Canons 2 (A) and 3 (A) (1).

3. *Mitigating and aggravating factors.* In order to determine the appropriate disposition of this matter, it is necessary to consider both mitigating and aggravating factors.

a. *Mitigating factors.* During the Judge's tenure at the Dorchester District Court, the court was (as it remains today) one of the busiest in the Commonwealth. The workload confronting the judges was enormous, and resources were scant. The courthouse's physical plant was grossly inadequate. There was insufficient office space for court employees, so trailers were assembled next to the building to create office space. There was insufficient storage space for records. Even extra space in restrooms served as space for the filing of records. There also was inadequate space for attorneys to meet with their clients; attorney-client conferences took place in the corridors. In short, as First Justice of the court, the Judge presided over a facility that simply was inadequate to meet the tremendous demands placed on it on a daily basis. In response, the Judge remained on the bench for unusually long workdays, often leaving the bench at the end of the day physically and emotionally drained. The Judge also carefully monitored courthouse activities so as to maintain order. There was evidence that the Judge occasionally overreached in his efforts to draw the greatest amount of effort from the employees of the court, not all of whom were equally able. As we read the record, however, this stemmed from a sincere desire to maintain a courthouse that, to the greatest extent possible given the circumstances, conducted its business in an efficient and timely fashion.

Early in his tenure as First Justice of the court, the Judge initiated innovative administrative programs. He always was accessible to community groups, often meeting with them at the courthouse or at their local meetings. Some of the Judge's goals and objectives were considered praiseworthy by the Regional Administrative Justice, who had occasion to visit many courts in the course of his duties and often advocated the Judge's ideas.

Since the Judge has been serving in the Stoughton District Court, he has conducted himself in a dignified manner, and treats the court employees with whom he works with courtesy and consideration. At the same time, the Judge has discharged his official duties in his usual diligent fashion, and

has significantly contributed to that court's efforts to reduce its recently expanded docket of remanded cases.

b. *Aggravating factors.* The record reveals that the Judge ignored efforts made by three of his judicial colleagues to get him to curtail some of the behavior for which he was charged with misconduct. At different times, Judge Dolan and Administrative Justices Mason and Zoll suggested to the Judge that some of his conduct and certain of his courtroom procedures were inappropriate. The Judge effectively ignored these entreaties, and instead stubbornly continued to conduct himself and his business in the same fashion.

The evidence also confirms a general insensitivity on the Judge's part to the concept of the appearance of impropriety. This is a cornerstone principle of the Code of Judicial Conduct, but the Judge's position was that (in his own words) he preferred doing good to looking good. However, the Code requires more than simply doing good. "A Judge must avoid all impropriety and appearance of impropriety. . . . He must . . . accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." *Matter of Killam*, 388 Mass. 619, 632 (1983), quoting E. Thode, Reporter's Notes to Code of Judicial Conduct 8 (ABA 1973). The Judge in a number of ways ignored this principle.

In addition, the record discloses a general pattern of questionable candor in the Judge's testimony indicating that he engaged in some stonewalling of the inquiry.

4. *Disposition.* We have carefully considered the charges and evidence against the Judge, and we have concluded that the Commission has established five distinct charges and violations of four canons of the Code of Judicial Conduct. Against these conclusions, we have weighed mitigating and aggravating factors. We have also kept in mind that part of the Judge's problems may be due to stress brought on by trying to work under conditions far more difficult than most judicial officers usually experience. After considering the recommendations of the Commission, we conclude that Judge

King should be publicly censured and that he should not serve again in the Dorchester District Court.

We decline to order a public apology as we do not consider such a sanction particularly appropriate or effective in this type of case. We also decline to order the payment of a fine. In prior cases, some decided under the earlier version of G. L. c. 211C, and others decided before its enactment, we generally approved the imposition of a monetary penalty where a judge received some personal benefit from his misconduct, see, e.g., *Matter of Ford*, 404 Mass. 347 (1989); *Matter of Morrissey*, 366 Mass. 11 (1974), or retained unearned compensation during the resolution of the proceedings, see, e.g., *Matter of Larkin*, 368 Mass. 87 (1975). Neither situation is present here. This is not to say that, in appropriate cases arising under the new G. L. c. 211C, the Commission may not recommend the imposition of a fine or the assessment of costs and expenses in circumstances that differ from the situations described in the cited decisions. See G. L. c. 211C, § 8 (4) (*f*) and (*g*), inserted by St. 1987, c. 656, § 2. In our view, however, this case is better disposed of by following the reported precedents.

Accordingly, Judge Paul H. King, by reason of his misconduct, is hereby censured and is permanently enjoined from sitting in the Dorchester District Court. The report, recommendations, and documentary appendix of the Commission and the Judge's response to the report shall be released with this opinion.

*So ordered.*