INQUIRY CONCERNING A JUDGE.

No. S–3675.

Supreme Court of Alaska.

Dec. 6, 1991.

---

George N. Hayes, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., for petitioner.

Philip R. Volland, Rice, Volland & Gleason for respondent.

Before CUTLER, CARPENETI, HODGES, SCHULZ, and TUNLEY,* JJ.

## OPINION

CUTLER, Chief Justice, Pro Tem.

This is a petition to reject a determination made by the Judicial Conduct Commission on December 7, 1989. The Commission found that petitioner violated several

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution and Appellate Rule 406(f).

judicial canons and recommended that petitioner be publicly admonished. Petitioner challenges the Commission's determination that there were violations as well as the Commission's recommendation for a public admonition. The petition is brought pursuant to Appellate Rule 406. We accept the Commission's recommendations in part and reject them in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was an officer, director and shareholder of City Mortgage Corporation (CMC). Petitioner also is a justice of the Alaska Supreme Court. Petitioner held both of these positions throughout 1987. Preceding and during 1987, CMC managed a portfolio of home and mobile home loans made by a state public finance corporation, the Alaska Housing Finance Corporation (AHFC). In 1987, AHFC sued CMC in state court for money that CMC had withheld from AHFC. The case was assigned to Superior Court Judge Peter Michalski. CMC counterclaimed for breach of contract, claiming the money withheld was for expenses incurred in its management of mobile homes covered by foreclosed AHFC mortgages. CMC sought reimbursement for the management expenses.

AHFC requested that CMC participate in a settlement conference. Petitioner was asked to be one of three members of a settlement panel. The proposed settlement, if one were reached, would be put to the Boards of Directors of AHFC and CMC. Petitioner agreed to be on the settlement panel.

On November 6, 1987, petitioner met with Charles Evans, counsel for AHFC. Petitioner and Evans agreed on the format and procedures for presenting evidence to the settlement panel. They also agreed to file a stipulation with Judge Michalski to delay rulings on certain motions then pending in the case. Later that afternoon, petitioner met Judge Michalski by chance in the courthouse parking lot and verbally related the stipulation to him. Judge Mi-

chalski requested that petitioner put their discussion into writing and send it to Evans.

On November 9 and 10, 1987, petitioner sent three letters to Evans. These letters were sent on petitioner's judicial "chambers" stationery and were typed by his secretary at the supreme court. The first letter, dated November 9, confirmed the agreement between petitioner and Evans regarding the procedures to be followed by the three-member settlement panel for hearing evidence. The second letter, also dated November 9, informed Evans that petitioner had encountered Judge Michalski in the courthouse parking lot. The third letter, dated November 10, confirmed petitioner's mailing of a settlement package to Evans.

On November 14, 1987, the settlement panel negotiated a settlement. The proposed settlement recommended that AHFC pay CMC $573,000 in exchange for CMC's release of claims against AHFC. The settlement subsequently was approved by CMC's Board of Directors. It was disapproved, however, by AHFC's executive director, Ron Lehr, and its attorney, Evans. Nonetheless, AHFC was required to present the proposed settlement at a public hearing to decide whether to accept the settlement. The hearing was scheduled for December 10, 1987.

Petitioner learned prior to the public hearing that Lehr intended to use his influence with the Governor to delay or cancel the public hearing. Petitioner called the Governor's office on December 7, 1987, to counterbalance Lehr's anticipated action. Petitioner was a long time acquaintance and friend of the Governor. Petitioner asked the Governor to meet with him on a personal matter.

A meeting was scheduled and took place the following evening at Anchorage International Airport. Petitioner met with Governor Cowper and Charity Kadow, director of the Anchorage Governor's office. At the meeting, petitioner expressed his view

that the public hearing should go ahead as scheduled. The Governor took no action as a result of the meeting.[1]

The public hearing was conducted as scheduled on December 10, 1987. AHFC went into executive session in the middle of the public hearing and then postponed the public hearing. The board of AHFC met again on December 21, 1987, at which time the settlement was approved. Reports of petitioner's involvement in the case subsequently became public.

The Judicial Conduct Commission filed a formal complaint against petitioner, after an initial investigation, pursuant to AS 22.-30.011(a) and Rule 9C(4) of the Commission rules. The Commission found probable cause to believe that petitioner had engaged in misconduct requiring discipline. The complaint alleged that petitioner had violated Canons 1, 2, 3, and 4 of the Code of Judicial Conduct as well as subsections (3)(C), (3)(D), and (3)(E) of AS 22.30.011(a).

Petitioner filed his answer on September 28, 1989, denying the allegations. The Commission appointed William Bankston as special counsel to present the formal charges, pursuant to Commission Rules 2C and 10A.

Bankston made an oral motion to dismiss the charges against petitioner on November 22, 1989, before the Commission Chairman. The Chairman denied the motion without prejudice, asking that it be re-presented to the full Commission at the formal disciplinary hearing scheduled for November 27, 1989.

Petitioner joined in special counsel's motion to dismiss before the full Commission. Petitioner and special counsel also stipulated to a set of facts for the Commission to consider on the motion. The Commission heard oral argument on the motion to dismiss and denied it.

Petitioner filed a motion for reconsideration with the Commission. The motion was based on the fact that he and special counsel had stipulated to dismiss the charges. The motion for reconsideration also was denied by the Commission.

The Commission adjudicated the complaint on December 7, 1989, finding that petitioner's use of court stationery, his manner of arranging a meeting with the Governor, and his actual meeting with the Governor created an appearance of impropriety in violation of Canons 1 and 2 of the Alaska Code of Judicial Conduct and AS 22.30.011(a)(3)(D) and (E). The Commission dismissed several other charges, finding that the other acts alleged did not result in a violation of any of the Judicial Canons or statutes. The Commission recommended to this court discipline in the form of a public admonishment.[2]

The Commission thereafter filed its determination and record pursuant to Commission Rule 12. On January 7, 1990, petitioner filed his petition to reject the recommendation of the Commission.

---

**1.** No written record exists of what transpired at the meeting.

**2.** At the time AS 22.30.011(d) provided:
 (d) The Commission may, after a hearing held under (b) of this section,
 (1) exonerate the judge of the charges;
 (2) informally and privately admonish the judge or recommend counseling;
 (3) reprimand the judge publicly or privately;
 (4) refer the matter to the supreme court with a recommendation that the judge be suspended, removed, or retired from the office or publicly or privately censured by the supreme court.
 In *In re Inquiry Concerning a Judge,* 762 P.2d 1292 (Alaska 1988) (hereinafter *Judge I*), the Alaska Supreme Court ruled that subsection (3) of this statute was in conflict with article IV, section 10 of the Alaska Constitution. The court found the Commission was without power to impose sanctions itself and could only recommend sanctions to the supreme court.
 Here, the Commission was aware of *Judge I* when it made its determination. The Commission recommended a public admonition without citing either AS 22.30.011(d)(2) or (d)(3). The Commission noted that public admonitions exist in many states. Determination at 12.
 We reject the Commission's recommendation for the reasons expressed in this opinion. We elect to impose a private reprimand under former AS 22.30.011(d)(3). This discipline is the same discipline chosen in *Judge I.*

## II. PRELIMINARY DISCUSSION

### A. THE ALASKA CODE OF JUDICIAL CONDUCT

The applicable judicial canons from the Code of Judicial Conduct are Canons 1, 2, 4 and 5.

Canon 1 states:

*A Judge Should Uphold the Integrity and Independence of the Judiciary*

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2 states:

*A Judge Should Avoid Impropriety and the Appearance of Impropriety in all His Activities*

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

Canon 4 states:

*A Judge May Engage in Activities to Improve the Law, the Legal System, and the Administration of Justice*

A judge, subject to the proper performance of his judicial duties, may engage in the following quasi-judicial activities, if in doing so he does not cast doubt on his capacity to decide impartially any issue that may come before him:

A. He may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice.

B. He may appear at a public hearing before an executive or legislative body or official on matters concerning the law, the legal system, and the administration of justice, and he may otherwise consult with an executive or legislative body or official, but only on matters concerning the administration of justice.

C. He may serve as a member, officer, or director of an organization or governmental agency devoted to the improvement of the law, the legal system, or the administration of justice. He may assist such an organization in raising funds and may participate in their management and investment, but should not personally participate in public fund raising activities. He may make recommendations to public and private fund granting agencies on projects and programs concerning the law, the legal system, and the administration of justice.

Canon 5 states in pertinent part:

*A Judge Should Regulate His Extra-Judicial Activities to Minimize the Risk of Conflict with His Judicial Duties*

C. Financial Activities.

(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.

(2) Subject to the requirement of subsection (1), a judge may hold and manage investments, including real estate, and engage in other remunerative activity including the operation of a business.

(3) A judge should manage his investments and other financial interests to minimize the number of cases in which he is disqualified. As soon as he can do so without serious financial detriment, he should divest himself of investments and other financial interests that might require frequent disqualification.

## B. THE STANDARD OF REVIEW

■ This court has the final authority in proceedings related to judicial conduct in Alaska. Alaska Const. art. IV, §§ 1, 10; *In re Inquiry Concerning a Judge,* 762 P.2d 1292 (Alaska 1988) (hereinafter *Judge I*); *In re Hanson,* 532 P.2d 303 (Alaska 1975). In exercising this power, the court is required to conduct an independent evaluation of the evidence. *In re Inquiry Concerning a Judge,* 788 P.2d 716 (Alaska 1990) (hereinafter *Judge II*). Independent review is required to ensure that "procedural due process has been accorded the judicial officer proceeded against and that the requisite findings of fact have been made and are supported by substantial evidence." *Judge I,* 762 P.2d at 1294.

Before we conduct a *de novo* review of the Commission's determination that petitioner created an appearance of impropriety in violation of the Code of Judicial Conduct, we first address a procedural issue raised by petitioner in regard to the Motion to Dismiss.

## C. THE COMMISSION DID NOT ERR IN DENYING SPECIAL COUNSEL'S MOTION TO DISMISS.

The motion to dismiss was based on special counsel's view that petitioner had not violated any of the judicial canons. This motion was denied by the Commission, even though petitioner joined in the motion.

Petitioner contends that the Commission erred in denying the motion to dismiss. Petitioner argues that the motion to dismiss should have been treated as an Alaska Civil Rule 41(e) dismissal that the Commission was obliged to accept. He contends that the Commission's discretion in regard to the stipulated motion is analogous to that of a trial court faced with a stipulated dismissal.

The Commission disagrees and responds by noting that the rules of civil and criminal procedure do not apply in their entirety to judicial conduct proceedings. The Commission argues that these proceedings are neither civil nor criminal but are special proceedings. The Commission further argues that the role of special counsel is merely to collect and present evidence and does not include the authority to dismiss charges. The Commission argues that only it is authorized to dismiss cases after a finding of probable cause. The Commission contends it fulfilled its duty by conducting an independent review of the motion to dismiss. The Commission disagreed with special counsel's findings after reviewing them upon consideration of the motion, and therefore denied the motion to dismiss.

■ We agree with the Commission's position regarding its discretion to deny the motion to dismiss. The Commission appropriately heard oral argument on the motion to dismiss and reviewed the record independently before denying the motion. Under Alaska law, the Commission is the only entity authorized to make judicial conduct recommendations to the supreme court or to decide not to make any recommendation. AS 22.30.011(d). A contrary finding would undermine the purpose and integrity of the Commission by permitting a sole individual to make an ultimate decision regarding judicial discipline.

## III. INDEPENDENT REVIEW ON THE MERITS

## A. PETITIONER'S CONDUCT CREATED AN APPEARANCE OF IMPROPRIETY IN VIOLATION OF JUDICIAL CANON 2.

■ The Commission determined that petitioner's conduct violated Canon 2 by creating an appearance of impropriety in three instances: petitioner's use of chambers stationery, petitioner's phone call to the Governor's office requesting a meeting with the Governor, and petitioner's meeting with the Governor.[3] The Commission declined to find that any of the conduct was actually improper, although the basis for that determination is not fully explained.

---

**3.** The Commission found that petitioner's parking lot encounter with Judge Michalski did not violate any of the judicial canons because "it was apparent at the time of the contact that no further legal proceedings were contemplated." We accept this finding by the Commission.

Petitioner challenges all three of the Commission's determinations of appearance of impropriety. Moreover, petitioner argues that the Commission applied the wrong test in evaluating his conduct.

### 1. *The Appropriate Test*

■ Both petitioner and the Commission have argued extensively over the test to be used to evaluate petitioner's conduct. They both argue that the test should be objective, but they propose different objective tests. The Alaska Supreme Court decided *Judge II* since the date the parties completed their briefing. *Judge II* is controlling as to the appropriate test. The test is whether a judge fails "to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot." 788 P.2d at 723. The *Judge II* court stated that "[t]he duty to avoid creating an appearance of impropriety is one of taking 'reasonable precautions' to avoid having a 'negative effect on the confidence of the thinking public in the administration of justice.'" *Id.* (quoting *In the Matter of Bonin*, 375 Mass. 680, 378 N.E.2d 669, 682–83 (1978)).

We reject both parties' arguments about how petitioner's conduct should be judged, and also reject the test actually used by the Commission. Instead, we employ the *Judge II* test. We decide whether petitioner failed to use reasonable care to prevent a reasonably objective individual from believing that an impropriety was afoot. This hypothetical objectively reasonable person forms his or her belief upon learning that petitioner had used chambers stationery in private litigation in writing letters to opposing counsel, had called the Governor to meet with him personally regarding a private business matter, and had met with the Governor on this private matter, with the matter ending in a settlement apparently favorable to petitioner's private business interest.[4]

The objectively reasonable person is not a well trained lawyer or a highly sophisticated observer of public affairs. Neither is this person a cynic skeptical of the government and the courts. Moreover, an objectively reasonable person is not necessarily one who is informed of every conceivably relevant fact. He or she is the average person encountered in society.

We now proceed to evaluate each instance of petitioner's disputed conduct through the eyes of this objectively reasonable person.

### 2. *Petitioner's Use of Chambers Stationery Created an Appearance of Impropriety.*

■ We agree with the Commission that petitioner's use of chambers stationery for the three private letters created an appearance of impropriety. We find by clear and convincing evidence[5] that a reasonably objective person would believe that the stationery was an attempt to influence opposing counsel and other viewers of the letters or that it had this effect.

Petitioner defends his use of the stationery by claiming he used chambers stationery, not official stationery, and by pointing out that the court system lacks any written policy restricting the use of chambers stationery. These arguments are weak. An objectively reasonable person would not know the difference between the two types of stationery or whether any policy exist-

---

**4.** This description of the basis of the objectively reasonable person's belief is not changed by petitioner's assertions on rehearing. Petitioner asserts on rehearing that the objectively reasonable person should find no appearance of impropriety because petitioner ultimately received no actual cash return due to the fact that later he divested himself of his interest in CMC subsequent to the settlement being paid. We find this later conduct irrelevant to the opinions of the thinking public at the time of the original acts. Later attempts to undo the harm may be con-

sidered in mitigation but they are not properly a part of the determination of whether an actual impropriety or the appearance of impropriety occurred. (We have considered petitioner's assertions about divesting himself of his interest, even though these assertions are outside the stipulated facts.)

**5.** The "clear and convincing" standard is required by *In re Hanson*, 532 P.2d 303, 308 (Alaska 1975).

ed.[6] Moreover, individual judges have an obligation to follow ethical constraints concerning the use of judicial stationery, notwithstanding any court system policy or lack of policy.

Petitioner next claims that the intended recipients of the letters were not influenced in fact by the chambers stationery. We find this fact irrelevant to the opinions of the thinking public who might see the letters in the public records. We find the stationery as used likely to cause members of the thinking public to believe that petitioner was unable to distinguish his judicial activities from his personal ones. This failure to maintain separate interests could lead a reasonable person to believe that petitioner's judicial decision-making ability similarly might be flawed.

Petitioner easily could have avoided risking a negative effect on the confidence of the public in the administration of justice. Petitioner could have used CMC's own stationery or plain stationery. Either would have avoided creating an appearance of impropriety.

3. *The Wording of Petitioner's Request to Meet with the Governor Did Not Create an Appearance of Impropriety.*

We reject the Commission's finding that petitioner's manner of arranging a meeting with the Governor violated the judicial canons. We do not agree that petitioner violated Canon 2 by the way he worded his phone call to the Governor's office.

■ The Commission found that petitioner violated the Canon by identifying himself as a justice when calling the Governor's office and by failing to clearly identify as personal the nature of his requested meeting with the Governor. Petitioner agrees that he identified himself as a justice when calling, but claims he specifically stated that he wanted "to speak with the Governor on a personal matter." Before the Commission, the parties stipulated to a set of facts supporting petitioner's assertion on this latter point, even though the Commission now argues that petitioner's statement that "he wanted to personally meet with the Governor" failed to specify that the meeting itself would be on a personal matter.

We do not find that a reasonably objective person would believe that an impropriety was afoot from petitioner's identification of himself as a "justice" when calling the Governor in the same conversation in which petitioner stated he was calling on a personal matter. The thinking public would know that many persons of title such as doctors and judges identify themselves or are identified by others, by their title, by habit. There is no evidence that petitioner intentionally used his title to get quick attention or failed to follow the use of his title with a statement that he was calling on a personal matter. We therefore find that the identification of petitioner by his title in the circumstances did not create the appearance of impropriety.

We have reviewed the stipulation entered into by petitioner and the commission as to petitioner stating he wanted to speak with the Governor on a personal matter. We find that the stipulation in petitioner's favor is supported by the record. We therefore accept the stipulation and find petitioner requested to meet on a personal matter creating no impropriety or appearance thereof.

4. *Petitioner's Meeting with the Governor Created the Appearance of Impropriety.*

■ We agree with the Commission that petitioner's meeting with the Governor created the appearance of impropriety. Petitioner challenges this determination, arguing that the Commission's decision means any private business meeting between a judge and the Governor violates the judicial canons. He contends such a result is at odds with Canon 5, which permits a judge

6. The appendix contains sample "official" stationery and "chambers" stationery. In conformity with the rules of confidentiality that govern these proceedings, the petitioner's name, which appears on the "chambers" stationery, has been deleted from the copy appearing in the appendix.

to conduct business activities. Petitioner also argues there was no appearance of impropriety in the meeting because he never asked the Governor directly to do him any favors, but merely reported Lehr's anticipated actions to the Governor.

We use the *Judge II* test in rejecting petitioner's arguments. The reasonably objective person would conclude that impropriety was afoot because petitioner had substantial private business interests that were involved in litigation against the state, petitioner was a justice of the state supreme court, and petitioner met personally with the Governor to discuss this litigation in an attempt to persuade the Governor to intervene in a manner favorable to petitioner's interests. We make this finding after careful review of the text and context of Canons 1, 2, 4 and 5.

Our analysis must start and end with the relevant canons. Canon 1 sets out the importance of an independent and honorable judiciary. This canon requires judges to participate in establishing and maintaining high standards of conduct to preserve the integrity and independence of the judiciary. Canon 1 also requires the other canons to be read and construed in such a manner as to further this objective.

Canon 2 echoes this emphasis on the integrity of the judiciary by requiring judges to avoid impropriety and the appearance of impropriety at all times. Canon 4 permits judges involved in quasi-judicial activities to consult with members of the executive or legislative branches "but only on matters concerning the administration of justice."

Finally, Canon 5 requires a judge to regulate his or her extra-judicial activities to minimize the risk of conflict with his or her judicial duties. Section C focuses on financial activities. Subsection C(1) clearly requires a judge to refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties or exploit his judicial position. Sub-

section C(2) limits a judge to holding and managing investments only if they do not conflict with the requirements of subsection (1).[7]

It is evident in reading all of these canons together and in focusing on the specific language the drafters employed that petitioner should have conducted his business activities only if they would not create the appearance of impropriety. Here, the creation of the appearance of impropriety is obvious. The reasonably objective person would be justified in believing that an impropriety was afoot upon learning of a personal meeting between a justice of the state supreme court and the Governor involving the justice's private business matters that were then in litigation with the state, notwithstanding the fact that the Governor took no action after the meeting.

There were reasonable steps that petitioner could have taken to avoid creating the appearance of impropriety. Petitioner could have foregone any meeting with the Governor. Petitioner could have asked someone from CMC to seek a meeting with and to actually meet with the Governor to argue CMC's position, although not on petitioner's behalf. Either action would have avoided petitioner's direct involvement on this issue and would have avoided the appearance of impropriety.

Petitioner's conduct created precisely the appearance of impropriety that the canons guard against. The reasonably objective person could easily conclude that petitioner was using the prestige of his office to encourage the Governor to intercede on his behalf. Petitioner stood to gain personally from the proposed settlement, from all appearances. This apparent self-interest distinguishes this case from one with no appearance of impropriety. The thinking public easily could conclude that the justice might someday return the favor to the Governor. Precisely this sort of conduct jeopardizes and erodes public confidence in the integrity and impartiality of the judi-

---

7. The formal complaint of the Commission does not charge petitioner with a violation of Canon 5.

ciary, and is prohibited by the judicial canons.

The judicial canons reflect the drafters' intent to limit judges' activities in a fashion that is not required of other citizens, even other citizens of public note. A judge may participate in extra-judicial activities only if these activities do not compromise the integrity of the judicial system. A judge carries restrictions on his or her personal life that are not imposed on members of the general public, on other public officials, on members of bar associations, or on anyone else. A New York court appropriately stated that "[m]embers of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved." *Lonschein v. State Comm'n on Judicial Conduct*, 50 N.Y.2d 569, 430 N.Y.S.2d 571, 572, 408 N.E.2d 901, 902 (1980).

We therefore accept the Commission's determination with respect to petitioner's meeting with the Governor that the meeting created the appearance of impropriety.[8]

## B. PETITIONER'S CONDUCT WARRANTS A PRIVATE REPRIMAND.

We next review the sanction recommended by the Commission. The Commission requested this court to publicly admonish petitioner. Alaska Statute 22.30.011 does not expressly authorize public admonishment as a sanction, however.[9] Moreover, a public admonishment appears inconsistent with the Commission's expressed

view that "the least severe sanction is appropriate" because there was only the appearance of impropriety. The Commission gave two reasons for opting for a public admonition. The Commission felt there was a need to emphasize to the public and other judges that a judge has an obligation to avoid the appearance of impropriety. The Commission also found that petitioner should be publicly cleared of any accusation of actual impropriety due to publicity about his role in the settlement. Petitioner opposes any public admonition based on such reasons and requests a private admonition if an admonition is to be administered.

The appropriate rules for judicial sanctions may be drawn from the test for determining appropriate sanctions against lawyers developed by the American Bar Association, even though judges are held to a higher standard of conduct than lawyers. *Judge II*, 788 P.2d at 723 & n. 11; *Disciplinary Matter Involving Buckalew*, 731 P.2d 48, 51–52 (Alaska 1986). This court has used the ABA Standards before to organize and analyze the relevant factors to be considered in both judicial and lawyer discipline sanction cases.

The ABA framework for determining appropriate sanctions is a four pronged test:

1. What ethical duty did the lawyer (judge) violate?

2. What was the lawyer's (judge's) mental state?

3. What was the extent of the actual or potential injury caused by the lawyer's (judge's) misconduct?

---

**8.** We have considered whether petitioner's conduct amounted to an actual impropriety, in violation of Canon 4, because he consulted with an executive official other than regarding the administration of justice. We find that Canon 4, by its title, applies only to quasi-judicial activities. The proscription in Canon 4 is not applicable because petitioner was not involved in quasi-judicial activities.

We note that Canon 4C of the ABA's new proposed Model Code of Judicial Conduct (1990), addressed in Judge Tunley's dissent, provides:

*Governmental, Civic, or Charitable Activities*
(1) A judge shall not appear at a public hearing before, or otherwise consult with, an executive or legislative body or official except on matters concerning the law, the legal system or the administration of justice or except when acting pro se in a matter involving the judge or the judge's interests.

We conclude from the title of this section that it also would not apply to petitioner's activities because they were not "governmental," "civic," or "charitable." Moreover, we note that even were the above code adopted for Alaska, a judge could only do what is permitted by that section if the judge could do so without creating an appearance of impropriety.

**9.** See footnote 2.

4. Are there any aggravating or mitigating circumstances?

*Judge II*, 788 P.2d at 724; *Buckalew*, 731 P.2d at 52 (quoting ABA Standards, Theoretical Framework, *reprinted in* ABA/BNA *Lawyers' Manual on Professional Conduct*, 01:805–01:806 (1986)).

The disciplining body first examines prongs 1 through 3 to determine the baseline sanction. Subsequently, the disciplining body determines whether any aggravating or mitigating circumstances justify a departure from the baseline sanction.

The duty violated here was the duty of the judicial officer to avoid creating an appearance of impropriety. This duty is only indirectly addressed in the ABA Standards because the appearance of impropriety is forbidden to lawyers in only limited ways whereas it very broadly applies to judges. "This is one area in which the Code of Judicial Conduct demands more of judges than the Disciplinary Rules do of lawyers." *Judge II*, 788 P.2d at 724. We therefore must decide for ourselves the seriousness of the violation. We do so in conjunction with addressing the third prong of the test, the amount of harm caused.

 We thus turn to a determination of petitioner's mental state. Specifically, we must decide whether petitioner's mental state was negligent, or purposeful and knowing. *Id.* Negligence is a failure "to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.* (quoting ABA Standards, Definitions, ABA/BNA 1:807). Here the record fails to clearly and convincingly prove a knowing or purposeful state of mind. It does reflect a negligent one, however. Petitioner failed to be aware of a substantial risk that his actions could result in a reasonably objective person believing that an impropriety was afoot.

Next we address the actual or potential harm caused by the violation. *Judge II* performed a lengthy analysis of these two types of harm. We give the *Judge II*

analysis great deference. In *Judge II*, the court found no actual harm even though the judge had made an unreasonable attempt to issue himself a reduced fare airplane ticket through a defunct airline. The court found no actual or significant harm because the potential difference in ticket price was only $20.60. The court recognized, however, that other harm was foreseeable from the judge's continued possession of a validating plate and blank stock. *Id.* at 724–25. Accepting the analysis of *Judge II*, we do not find any actual harm here because the Governor did not do petitioner any favors after the meeting. We clearly find that potential harm could result from the undermining of the public's confidence in the judiciary, however. We find therefore that the violation is moderately serious even though no actual harm resulted.

Accordingly, we find using the first three parts of the test above that the appropriate baseline sanction here is a private reprimand. Our conclusion is supported by the ABA sanction philosophy that has been commented on by this court before. *Id.* at 726. This sanction philosophy suggests that "[w]here the violation, whatever its nature, involves only negligent conduct which occasions little injury, the recommended sanction is admonition, or private reprimand." *Id.* at 725. We follow the *Judge II* application of the baseline sanction of private reprimand for a violation involving the same mental state and degree of injury.

We note that public admonishments generally are administered only in cases involving blatant violations of the Code of Judicial Canons, according to cases from other jurisdictions. *See Gubler v. Commission on Judicial Performance*, 37 Cal.3d 27, 207 Cal.Rptr. 171, 688 P.2d 551 (1984) (wrongful attorney fee collecting practices against criminal defendants, doubling attorney fees imposed on defendant represented by public defender, authorizing release of confiscated guns for sale by defendants); *In re Hayes*, 541 So.2d 105 (Fla. 1989) (judge's discussions with journalist of progress of murder trial on multiple occa-

sions knowing journalist would use material); *In re Ford,* 404 Mass. 347, 535 N.E.2d 225 (1989) (judge serving as CEO of non-profit corporation while serving as a judge); *In re Kiley,* 74 N.Y.2d 364, 547 N.Y.S.2d 623, 546 N.E.2d 916 (1989) (lending and appearing to lend the prestige of office to advance private interests of criminal defendants); *In re Derrick,* 301 S.C. 367, 392 S.E.2d 180 (1990) (conviction of crime of moral turpitude based on breach of trust with fraudulent intent); *In re Pearson,* 299 S.C. 499, 386 S.E.2d 249 (1989) (referring to another person as a "nigger lover"). Petitioner's conduct does not rise to the level of severity of the conduct in these other cases. The ABA Standards are designed to promote consistency in discipline. ABA Standards for Imposing Lawyer Sanctions, ABA/BNA 01:801–01:804. We find that the reasoning of *Judge II* applies well to the case before the court, and therefore we conclude that a private reprimand is the appropriate baseline sanction.

▮▮▮▮ Finally we consider whether this private reprimand should be subject to increase or decrease depending upon the presence of aggravating or mitigating factors. *Judge II,* 788 P.2d at 725. We use the aggravating and mitigating factors set out by the ABA Standards.[10]

▮▮▮ We find five mitigating factors in this case. There is an absence of prior disciplinary proceedings, petitioner has co-operated with the disciplinary process although he does not admit wrongdoing, petitioner has asserted he subsequently divested himself of his business interest before the press reported the matter and in fact took a loss in so doing, the petitioner has an excellent reputation, and there was a delay in the initiation of disciplinary proceedings. We find two aggravating factors. There was selfish motive on petitioner's part at the time, and he has had substantial experience in the practice of law.

We find there should be no departure from the baseline sanction, after balancing the applicable mitigating and aggravating factors and upon review of the sanctions imposed by other courts. We have weighed most heavily among the aggravating factors petitioner's substantial experience in the practice of law. We take particular note with respect to the three letters sent to Evans. Petitioner should have realized that these materials could come to the attention of the public and therefore harm the judiciary, even if he meant no harm by them. This aggravating factor is offset by the mitigating factors of timely effort to rectify consequences, the lack of actual harm from the conduct and petitioner's continued excellent reputation. Additionally, there was nearly a two-year delay between the conduct in question and the bringing of charges by the Commission, with petitioner's conduct remaining above

---

10. The mitigating factors set out by the ABA are:
 (a) absence of a prior disciplinary record;
 (b) absence of a dishonest or selfish motive;
 (c) personal or emotional problems;
 (d) timely good faith effort to make restitution or to rectify consequences of misconduct;
 (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
 (f) inexperience in the practice of law;
 (g) character or reputation;
 (h) physical or mental disability or impairment;
 (i) delay in disciplinary proceedings;
 (j) interim rehabilitation;
 (k) imposition of other penalties or sanctions;
 (*l*) remorse;
 (m) remoteness of prior offenses.
 *Judge II,* 788 P.2d at 725 (quoting ABA Standard 9.32, *reprinted in* ABA/BNA *Lawyers' Manual on Professional Conduct* 01:842 (1986)).

The aggravating factors set out by the ABA are:
 (a) prior disciplinary offenses;
 (b) dishonest or selfish motive;
 (c) a pattern of misconduct;
 (d) multiple offenses;
 (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
 (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
 (g) refusal to acknowledge wrongful nature of conduct;
 (h) vulnerability of victim;
 (i) substantial experience in the practice of law;
 (j) indifference to making restitution.
 *Id.* (quoting ABA Standard 9.22, ABA/BNA 01:841–42).

reproach throughout. A private reprimand best serves the paramount concern of "protection of the public, the courts, and the legal profession." *Buckalew*, 731 P.2d at 56.

## IV. CONCLUSION

We accept in part and reject in part the recommendation of the Judicial Conduct Commission that petitioner be found in violation of several judicial canons. We reject the recommendation of the Judicial Conduct Commission for a public admonishment. The reprimand will be private.

HODGES, SCHULZ and TUNLEY, JJ., concur in part and dissent in part.

HODGES, Judge, concurring and dissenting.

I concur with the majority on the following issues:

1. The standard of review to be applied is independent review;

2. The Commission did not err in denying special counsel's motion to dismiss;

3. The test articulated in *In re Inquiry Concerning a Judge*, 788 P.2d 716 (Alaska 1990) (*Judge II*), is the test to be applied; [1]

4. The use of chambers stationery created the appearance of impropriety; and

5. A private reprimand is the appropriate sanction.

I dissent from the majority on the following issues:

1. Their reversal of the Commission's finding that calling the Governor's office was the appearance of impropriety; and

2. Their finding that meeting with the Governor was only an appearance of impropriety.

## APPENDIX

Chief Justice
(Name Deleted)

Justices
(Names Deleted)

303 K STREET
ANCHORAGE, ALASKA 99501
(907) 264-0618

Supreme Court
State of Alaska

1. The majority discusses the test in the context of an objectively reasonable person and goes on to define in some detail what that "person" is. I do not feel that it is necessary to define "an objectively reasonable person" other than it is "an objectively reasonable person." Further, in the majority's opinion (at 1340, 1340 n. 4, 1341), they use the "thinking public" in applying the test. I disagree with the majority's use of the "thinking public." The majority either equates the "thinking public" with the "objectively reasonable public" or changes the test in its application.

## Supreme Court
### State of Alaska

Chambers of
(Name Deleted)
Justice

303 "K" Street
Anchorage, Alaska
99501-2083

The Commission determined that calling the Governor's office to arrange a meeting, identifying himself as a justice but not clearly indicating it was on a purely private matter created the appearance of impropriety. I agree that this creates an appearance of impropriety. An objectively reasonable person would conclude that petitioner was using his position as a supreme court justice—that is, his judicial position— to arrange a meeting with the Governor on a purely private business matter.

In the factual context of the call to the Governor's office, I find that a reasonably objective person would believe that an impropriety was afoot. The majority views the call to the Governor's office in isolation. Under the facts of this case, that view is unrealistic—the call must be viewed in light of all the surrounding circumstances. When this is done, a reasonably objective person would believe that petitioner was attempting to use his judicial position for private gain—using his judicial position to influence the Governor regarding the settlement.

In isolation, the mere call to the Governor's office is not improper, but when viewed in context—which you must do—it is!

The Commission determined that petitioner's meeting with the Governor did not constitute an actual impropriety, but only the appearance of impropriety. It is not entirely clear how the Commission reached

this conclusion. It appears that the Commission based its determination on the relationship of Canons 2, 4 and 5.

Petitioner challenges the determination that the meeting created even the appearance of impropriety. He contends that the Commission's decision means any private business meeting between a judicial officer and the Governor violates the judicial canons. He argues that this result is at odds with Canon 5, which permits a judge to engage in business activities. He further contends that since the Governor took no action—was not influenced by the meeting—there was no apparent or actual impropriety. Apparently petitioner feels that you can attempt to improperly influence someone, but if they are not influenced, there is no improper conduct. This argument is patently without merit.

Canon 5 permits judicial officers to engage in private business matters. It does not grant carte blanche to permit engaging in private business and violate the Canons. Extreme care must be exercised by judges in their private business affairs.

Upon independent evaluation of the evidence, I find that the meeting with the Governor was actually improper. Therefore, I disagree with the Commission's finding that the meeting with the Governor was only an appearance of impropriety. In making this determination, the judge's conduct must be analyzed in relation to the Judicial Canons. Canon 1 emphasizes the

need for an independent and honorable judiciary; judges must maintain high standards of conduct to preserve the integrity and independence of the courts. The other judicial canons must be construed to further this objective.

That judges should avoid impropriety and the appearance of impropriety is reemphasized in Canon 2. Canon 3 dictates that a judge's judicial duties take precedence over all of his other activities. Canon 4 permits, subject to the proper performance of his duties, engaging in activities to improve the "Law, Legal System and the Administration of Justice." Canon 5 requires that a judge should regulate his extra-judicial activities to minimize the risk of conflict with his judicial duties. Specifically, Canon 5 provides:

C(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.

Subsection C(2) provides that a judge may manage investments, but only if it does not conflict with subsection C(1). Thus it is clear that a judge must refrain from financial or business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties or exploit his judicial position. If there is any conflict or potential conflict the judge must refrain from acting in furtherance of his business activity.

In evaluating petitioner's conduct in light of the Canons, I find that petitioner's meeting with the Governor on a private business matter in litigation against a state public finance corporation was an actual impropriety. Petitioner is a member of the state's highest court. He arranged a meeting with the Governor, the highest member of the executive branch, to attempt to have the Governor intercede for him on a purely private financial matter. This is precisely

the kind of activity that the Judicial Canons prohibit. An objectively reasonable person would conclude that petitioner was using his judicial position for his own direct financial interests.

Petitioner apparently had a large personal financial stake in the proposed settlement.[2] An objectively reasonable person would conclude that petitioner would use his judicial position to further his own financial interests. This casts doubt on petitioner's judicial integrity.

It is this apparent large financial self-interest that distinguishes the facts of this case from other judicial conduct cases where the court has found only an appearance of impropriety.

*In re Hanson*, 532 P.2d 303 (Alaska 1975), is an example. In the *Hanson* case, the sole resident judge of Kenai had dinner in a public restaurant with the Mayor, who was an "old friend," for the purpose of encouraging the public to support the Mayor's troubled grocery business. The Commission concluded that the judge's conduct constituted use of his judicial office "to promote private business interests, in violation of Canon 25 of the Canons of Judicial Ethics ... and ... conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of AS 22.30.070(c)(2)." 532 P.2d at 309. We held that the Commission was in error in concluding that there was a violation of Canon 25 or AS 22.30.070(c)(2). In so holding we stated:

The instant case presents a single isolated occasion of a judge having dinner with a family friend, who has not been indicted. This is a far cry from the type of improper conduct which Canon 25 was designed to prohibit. Judged by objective standards, any signal emanating from this public repast was rather weak and ambiguous and one that we cannot characterize as involving improper persuasion or coercion, or the appearance thereof, employed to promote the grocery business of Mayor Steinbeck.

*Id.* at 311.

---

**2.** Although not included in the record before the Commission evidence has been received that shortly after the settlement was reached Petitioner divested himself of any interest in CMC,

did not receive any monies as a result of the settlement, and transferred his stock to the corporation at a financial loss.

The present case is readily distinguished from the *Hanson* case. A justice of the highest court of the state met with the Governor, the state's highest executive officer, to persuade him to intercede on petitioner's behalf in a matter involving litigation between petitioner's company and a state public finance corporation. If the proposed settlement went forward, petitioner apparently stood to gain financially from the settlement. An objectively reasonable person could easily believe that any involvement by the Governor favorable to petitioner would result in a quid pro quo—that the justice would someday return the favor to the Governor. It is precisely this type of conduct that jeopardizes and erodes public confidence in the integrity and impartiality of the judiciary. This is clearly prohibited by the Code of Judicial Conduct.

The Code of Judicial Conduct limits judges' extra-judicial activities more so than the ordinary citizen or other public figures. A judge may participate in extra-judicial activities only if they do not compromise the integrity of the judicial system. In some situations it may be acceptable for a private person to act, but not a judge. There may be some instances where the judge has to decline to participate.

Petitioner had a range of choices in his involvement with CMC. Although a director and shareholder it was not necessary for him to become actively involved in the settlement negotiations. If he did, as he did here, he had to act cautiously to make sure that what occurred here did not happen. Clearly he should not have used court stationery—there was a reasonable alternative—blank or CMC stationery; he should not have called or met with the Governor—there was a reasonable alternative—he could have ignored the possibility that the public hearing might be delayed or canceled, or he could have requested another member or employee of CMC to meet with the Governor. A better approach would have been to decline participation in the settlement panel, since a reasonable alternative would have been to have another member of CMC participate. A judge may have business dealings but must do so cautiously; passive rather than active participation is the watch word. Here petitioner became actively involved, casting a shadow on his ability to be impartial in his judicial duties.

A judge's responsibility and obligation to maintain the public's confidence in the judicial system is clearly set out in the Code of Judicial Conduct. These restrictions apply to both judicial and non-judicial activities. The Code places restrictions on a judge's personal life that are not imposed on members of the general public, public figures, or members of the bar. As pointed out in *Lonschein v. State Comm'n on Judicial Conduct*, 50 N.Y.2d 569, 430 N.Y.S.2d 571, 572, 408 N.E.2d 901, 902 (1980):

> Members of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved. There must also be a recognition that any actions undertaken in the public sphere reflect, whether designedly or not, upon the prestige of the judiciary. Thus, any communication from a Judge to an outside agency on behalf of another, may be perceived as one backed by the power and prestige of judicial office.... Judges must assiduously avoid those contacts which might create even the appearance of impropriety.

(Citation omitted).

I find that the Commission erred in concluding that petitioner's conduct created only the appearance of impropriety. I find that the meeting between petitioner, a justice of the state's highest court and the Governor, the highest executive officer in the state, on personal business of the justice relating to a financial dispute with a state agency constitutes actual impropriety.

SCHULZ, Judge, concurring in part and dissenting in part.

The Alaska Commission on Judicial Conduct (the Commission) found the petitioner violated Canon 2 of the Code of Judicial

Conduct.[1] That finding compelled the further finding that petitioner's conduct violated Canon 1[2] and AS 22.30.011(a)(3)(D) and (E).[3]

Based on an incomplete recitation of "facts" and an erroneous application of the objectively reasonable person test enunciated by this court in *In re Inquiry Concerning a Judge*, 788 P.2d 716 (Alaska 1990) (*Judge II*), a majority of this court today affirms the Commission's findings in two respects.

I dissent.

In *Judge II*, this court said:

The duty to avoid creating an appearance of impropriety is one of taking "reasonable precautions" to avoid having *"a negative effect on the confidence of the thinking public,* in the administration of justice." Otherwise stated, did appellant fail to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot?

1. Canon 2:
 *A Judge Should Avoid Impropriety and the Appearance of Impropriety in all His Activities*
 A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
 B. A judge should not allow his family, social or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interest of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

2. Canon 1:
 An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

3. AS 22.30.011(a)(3)(D) and (E):
 (a) The Commission shall on its own motion or on receipt of a written complaint inquire into an allegation that a judge
 . . . .
 (3) within a period of not more than six years before the start of the current term, committed an act or acts that constitute
 . . . .

788 P.2d at 723 (quoting *In the Matter of Bonin*, 375 Mass. 680, 378 N.E.2d 669, 682–83 (1978)) (emphasis added).

That is the test which the court applies today. Unfortunately, the court has become very selective in determining what it is that the "thinking public" or "objectively reasonable persons" think about. For instance, the court either totally ignores, or gives far too little weight, to the fact that while petitioner used court stationery in a private matter, the stationery was provided for whatever purpose the justice wanted to use it.[4] As the court points out, the petitioner used the chambers stationery to memorialize agreements between him and opposing counsel in litigation in which he was directly involved, and in which he was participating at the opposing parties' request. Why it is that "objectively reasonable persons" have to ignore those facts is beyond my ken.[5]

(D) conduct that brings the judicial office into disrepute; or
(E) conduct in violation of the code of judicial conduct;

4. I express no opinion as to whether or not that is a good or a bad rule. If the rule is bad, however, the rule should be changed before we sanction someone for violating what I can only characterize as a highly subjective expectation for judicial conduct.

5. It is interesting that the thinking public or *objectively* (emphasis added) reasonable persons of *Judge II* have become so selective. For instance, the record in this case makes it clear that petitioner took part in the settlement process in 1987 because he was asked by the other parties. They knew who he was, and apparently were not terrified by his position. Further, petitioner tendered all of his stock in the corporation at no cost to the corporation on December 29, 1987, well before this matter became a subject of public discussion. In short, whether the settlement was favorable or unfavorable to CMC or petitioner is irrelevant because petitioner took no part of the settlement in any event. The record is also clear that the merits of the settlement were never discussed between the Governor and petitioner at their meeting. The majority never addresses a central issue in this case and that issue is simply why all of the facts are not relevant and if all of the facts are not relevant, what is the test for determining what is relevant and what is not. So much for the objective test.

While I agree with the premise that an objectively reasonable person is not necessarily fully informed, (Maj.Op. at 1340–1341), it does seem that the objectively reasonable person should be aware of at least some of the surrounding circumstances and at least a little of the content of the letters before jumping to the conclusion, as the majority does, that an impropriety may be afoot.[6] The court also concludes that petitioner's meeting with the Governor created the appearance of an impropriety because "petitioner had substantial private business interests that were involved in litigation against the state, petitioner was a justice of the state supreme court, and petitioner met personally with the Governor to discuss this litigation in an attempt to persuade the Governor to intervene in a manner favorable to petitioner's interests." (Maj.Op. at 1342).

First, the court is simply wrong when it says that petitioner met with the Governor to discuss the petitioner's business interests. That conclusion is not supported by the record in the case. Neither the nature of petitioner's business interests nor the terms of the settlement agreement were ever mentioned in the meeting with the Governor. Petitioner met with the Governor because the petitioner had information that Evans, who represented AHFC in the litigation, and the Executive Director of AHFC were trying to torpedo a settlement process that CMC had entered into in good faith. Petitioner never asked the Governor to change anybody's mind or to attempt to influence the AHFC board to accept or reject the settlement. Second, the court's conclusion that the litigation concluded with a favorable settlement for petitioner is not supported by the record. According to the record, the settlement proposal was reached after the use of a well recognized "mini-trial" procedure and was ultimately approved by both parties. The record contains no information and the Commission made no findings on whether or not the

settlement was favorable to CMC, to petitioner, or to AHFC. The record in this case would not support a finding on that point in any event.

Third, the court cavalierly suggests that petitioner could have avoided the appearance of impropriety by foregoing the meeting with the Governor entirely. (Maj.Op. at 1342). The court cites no authority for the proposition that the petitioner should roll over and play dead simply because he happens to be a justice, when confronted with at least delay, and quite probably deliberate obstruction, by executive branch officials. Until today, there was no authority for that proposition.

Next, the court suggests that petitioner could have done indirectly what he should not do directly by having someone on the CMC staff arrange a meeting and actually meet with the Governor. (Maj.Op. at 1342–1343). To suggest that such a manipulative course of action would avoid the appearance of impropriety only recognizes that it would be more difficult for the objectively reasonable person to find out about it. More troublesome, however, is the question of what test we apply in the case of a sole proprietorship without executive type staff.[7] The court also considers it significant that the litigation concluded with a favorable settlement for petitioner. (Maj.Op. at 1343). What this has to do with the meeting with the Governor is not divulged by the majority probably because there is no evidence that the terms of the settlement were discussed at the meeting. In fact, the record discloses that the terms of the settlement and who it was favorable or unfavorable to were never discussed at the meeting.

Finally, since the court has correctly concluded that there was nothing wrong in asking for the meeting in the first place, it seems a strange leap in logic to conclude that the meeting itself somehow created an appearance of impropriety.

---

6. The majority's conclusion on the use of chambers stationery cannot rest on a violation of some rule against using the stationery for the simple reason that there is no rule.

7. This, of course, assumes that CMC had "staff" that could arrange a meeting with the Governor and discuss the AHFC board meeting. The record seems quite silent on what sort of "staff" options petitioner actually had.

I have absolutely no quarrel with the proposition that judges, because of the nature of their office, must maintain the highest standards of conduct in both their judicial and extra-judicial affairs, and, further, it must appear that judges maintain those standards. Until today, I had thought that *Judge II* provided a reasonably objective standard by which to measure that conduct in appearance of impropriety cases. Unfortunately, for the public and the bench, I am apparently wrong.

I agree with the majority that the Commission did not err in denying special counsel's motion to dismiss. Otherwise, I dissent.

TUNLEY, Judge, concurring in part and dissenting in part.

I concur with the dissent of Judge Schulz, respectfully adding a few further comments.

Petitioner was requested by all parties to sit on the settlement panel. While serving thereon he used his judicial chambers court stationery to memorialize agreements and meetings. These writings were only distributed among the other members of the settlement panel. There was at that time no court rule or policy against justices using their chambers stationery for such purposes nor is there presently. Any objectively reasonable person who was reasonably informed could only conclude no impropriety was afoot when reviewing the files containing these letters as that person would understand the background of these letters and such was only private chambers stationery.

Concerning the meeting with the Governor, petitioner was only making sure the agreement agreed upon by the settlement panel would see the light of day at a public hearing. It was not for a private purpose. Any objectively reasonable person who was reasonably informed could only conclude no impropriety was afoot. Petitioner, as a member of the settlement panel, met with the Governor so as to prevent Lehr from using his influence with the Governor to delay or cancel the public hearing taking place whereat the Board of AHFC would decide whether to accept the settlement agreement approved by the panel. No discussion was had concerning the settlement agreement itself. Ms. Kadow, Director of the Governor's Anchorage office, attended the meeting so it cannot be labeled a private meeting.

Certainly the test of *In re Inquiry Concerning a Judge*, 788 P.2d 716 (Alaska 1990) (*Judge II*), must include the requirement that objectively reasonable persons be reasonably informed. In my opinion, the majority fails to acknowledge that the reasonable person must also be reasonably informed of the surrounding circumstances. The test of *Judge II* certainly is not a "hindsight" test. I believe the majority employ a test of "hindsight" in determining the appearance of impropriety in this case while professing they do not. Based upon such "hindsight," the majority today condemn business activity of a most respected member of the highest court of this state, a state that allows members of the judiciary to "engage in other remunerative activity including the operation of a business." Judicial Canon 5C(2). Also, petitioner was asked by all involved to partake therein. Further, based on information now before this court, petitioner divested himself of his interest in the business long before this matter was publicly reported, petitioner losing a considerable amount of money in such divestment. Pursuant to the test of *Judge II*, the complaints against petitioner just do not establish an appearance of impropriety, and the majority opinion is just completely wrong.

As I pen my thoughts herein, a wave of deep concern for the judiciary of this state washes across my spirit. Judges must live in the real world, and I don't believe they should be expected to sever all ties with it upon taking the bench. They would thus isolate themselves from the rest of society. Involvement in the outside world is necessary to enrich judicial temperament and to enhance a judge's ability to make difficult decisions.[1] I am fearful the majority's de-

---

**1.** Acknowledgement for my statements on the role of the judiciary is given to the authors of

cision will further isolate our judiciary from the real world. My brethren and I, both at bench and bar, must have faith that today's interpretation of what is an appearance of impropriety when washed with the sands of time, will not last long.[2]

I concur with the majority in concluding that the petitioner's request to meet with the Governor did not create the appearance of impropriety. Lastly, I concur with the majority in concluding that the Commission did not err in denying special counsel's motion to dismiss.

I am authorized to say that Judge Schulz joins in the above comments.

*Judicial Conduct and Ethics,* J. Shaman, S. Lubet & J. Alfini, at 2 (1990).

**2.** I refer also to the final proposed *1990 Model Code of Judicial Conduct of the American Bar Association* (ABA) which was recommended by the Standing Committee on Ethics and Professional Responsibility of the ABA for consideration by the House of Delegates of the ABA in 1990. I can find nowhere in this *Model Code of Judicial Conduct* any transgression thereof in the conduct of petitioner condemned by the majority today. In fact, Proposed Canon 4C(1) clarifies that a judge may consult with an executive official "in a matter involving the judge or the judge's interests."